George **KWATCHER,**
Plaintiff, Appellant,

v.

**MASSACHUSETTS SERVICE EMPLOY-
EES PENSION FUND,**
Defendant, Appellee.

No. 88–1930.

United States Court of Appeals,
First Circuit.

Heard April 7, 1989.
Decided July 5, 1989.

Jack J. Mikels with whom Rochelle S. Nelson and Jack Mikels & Associates, Boston, Mass., were on brief, for plaintiff, appellant.

Michael J. Muse, Boston, Mass., for defendant, appellee.

Before BOWNES and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

SELYA, Circuit Judge.

This dispute requires us to construe certain provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, which, over time, have proven less than transparently clear. Immersion in the ammonia of appellate analysis dispels much of the fog, however, and makes the interplay of these provisions, and their import, easier to visualize. Reflecting what we believe to be Congress's manifest intent, we affirm the principal holding below. At the same time, we remand so that the district court may undertake certain further proceedings.

## I. THROUGH A GLASS, DARKLY

The pertinent facts are largely uncontested. Plaintiff-appellant George Kwatcher began working as a window-washer in 1934. Some fourteen years later, Kwatcher took over a small corporation, Astor Window Cleaning Co.[1] As sole shareholder and chief officer, plaintiff oversaw hiring, firing, and employee discipline; executed contracts on Astor's behalf; and represented the company in collective bargaining. Astor's work force varied according to need, usually including five to fifteen window-washers. Throughout, Kwatcher belonged to the Service Employees International Union (Local 254) and Astor was a member of an employers' organization, the Maintenance Contractors of New England (MCNE).

In 1973, the Union and MCNE executed a trust declaration creating the defendant-appellee Massachusetts Service Employees Pension Fund (Fund). Beginning in 1973 (or perhaps thereafter), Astor apparently made contributions to the Fund on Kwatcher's account. Under a pension plan agreement (Plan) signed in 1981, presumably a successor to an earlier contract, certain subscribing employers (including Astor) agreed to contribute to the Fund on behalf of their eligible employees in amounts set from time to time by collective bargaining. In July 1982, Kwatcher retired and requested his pension. Initially, the Fund gave its approval and commenced monthly pension payments. In 1983, the Fund changed course and discontinued the stipend. Plaintiff, believing himself unfairly disadvantaged by this tergiversation, brought the instant suit.

After certain preliminary skirmishing, the parties filed cross-motions for summary judgment. The district court granted the Fund's motion, reasoning that Kwatcher, as a business owner, was not eligible for inclusion in an ERISA-regulated retirement plan. Plaintiff moved for reconsideration, asserting that he was at least entitled to benefits based upon the fourteen years he had worked in the industry before acquiring Astor. When that motion was summarily denied, plaintiff brought the matter to this court.

The appeal rests upon a scaffolding composed of three segments. First and foremost, Kwatcher argues that he was not an "employer" as that term is used in ERISA.[2] Second, Kwatcher contends that, even if he became an "employer" upon assuming control of Astor, benefits should still have accrued for the period 1934–49. Third, if not entitled to benefits at all, Kwatcher

---

* Of the District of Massachusetts, sitting by designation.

1. In 1981, plaintiff formed a successor corporation (AWC, Inc.). The change in enterprise structure has no bearing on this case. Accordingly, we use the sobriquet "Astor" to refer to both corporations interchangeably.

2. The parties' dispute on this basic point is narrow. The Fund does not claim that Kwatcher is disqualified under the terms of the Plan. *Cf., e.g., Aitken v. IP & GCU–Employer Retirement Fund,* 604 F.2d 1261, 1265 (9th Cir.1979). To the contrary, defendant relies solely upon provisions of ERISA, 29 U.S.C. § 1103(c)(1), and of the Labor Management Relations Act, 29 U.S.C. § 186, to foreclose Kwatcher's pension. In the same vein, Kwatcher limits the thrust of his appeal to the contention that he was an "employee" rather than an "employer" under ERISA. We therefore have no occasion to consider whether, as a matter of contract interpretation, Kwatcher is or is not entitled to Plan benefits. *See generally United States v. Kobrosky,* 711 F.2d 449, 454 (1st Cir.1983) (court of appeals need not adjudicate issues neither briefed nor argued).

maintains that appellee must refund the contributions it received on his behalf. We address these points *seriatim.*

## II. WINDOWS ON THE ACT

The crux of this case is whether ERISA permits a sole shareholder who is employed by the corporation he owns to participate in an ERISA-regulated pension plan. The majority of courts to address the issue, like the court below, have concluded that such "dual status" individuals are barred from participation. *See, e.g., Peckham v. Board of Trustees, Etc.,* 653 F.2d 424, 427 (10th Cir.1981) (*Peckham I*); *McHugh v. Teamsters Pension Trust Fund,* 638 F.Supp. 1036, 1043-44 (E.D.Pa.1986); *but see Dodd v. John Hancock Mutual Life Ins. Co.,* 688 F.Supp. 564, 571 (E.D.Cal.1988) (contra). Numerous windows offer insight into the matter, including the statute itself, its legislative history, and the applicable regulations. After peering through them, we are convinced that Congress meant to divorce owner-employees from plan participation.

### A. *Statutory Text.*

■ It is apodictic that statutory interpretation must start with the statute itself. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). "So long as the statutory language is reasonably definite, [it] must ordinarily be regarded as conclusive (at least in the absence of an unmistakable legislative intent to the contrary)." *United States v. Charles George Trucking Co.,* 823 F.2d 685, 688 (1st Cir.1987). We feel confident that the words of ERISA, and the casement in which they are set, go a long way toward resolving the central question before us.

In enacting ERISA, Congress designed a comprehensive system of federal law to regulate the operations of employee benefit plans. This legislative initiative was a "massive undertaking," *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 44, 107 S.Ct. 1549,

1551, 95 L.Ed.2d 39 (1987). Its mainframe components are codified in two subchapters. Part I, 29 U.S.C. §§ 1001-1168, includes all of ERISA's provisions anent reporting and disclosure, participation and funding, and fiduciary responsibility. Part III, 29 U.S.C. §§ 1301-1461, establishes a multifaceted system to protect workers against employers' attempts to terminate, or withdraw from, employee benefit plans. This case requires that we train our focus on Part I.

Part I contains a lengthy laundry list of definitions developed expressly for use within the subchapter. *See* 29 U.S.C. § 1002; *see generally DeBreceni v. Graf Bros. Leasing, Inc.,* 828 F.2d 877, 879-80 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1024, 98 L.Ed.2d 988 (1988). To recover benefits, Kwatcher must be a "participant" in the Plan. *See* 29 U.S.C. § 1132(a)(1)(B). The "participant" category is restricted:

> The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7).[3]

"Employee" and "employer" are plainly meant to be separate animals; under Part I, the twain shall never meet. An "employee" is "any individual employed by an employer." 29 U.S.C. § 1002(6). Congress intended this definition to encompass those persons "who ha[ve] the status of an 'employee' under a collective bargaining agreement." H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News at 4639, 4648; S.Rep. No. 127, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code, Cong. & Admin.News at 4838,

---

3. Appellant has not argued that his union membership, by itself, makes him eligible for pension benefits. In any event, the Plan requires all "participants" to be employed within a bargaining unit. *See* Plan §§ 2.9, 2.12. Kwatcher does not claim that he was an employee within the bargaining unit in 1973 or thereafter; and it is virtually unthinkable that, as Astor's owner and chief executive officer, he could have qualified for inclusion.

4851. Given conventional labor-law principles, that refinement of the "employee" rubric seemingly excludes management figures. *See generally NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974).

The dichotomy becomes even clearer when we examine the flip side of the coin. In contradistinction to its relatively narrow definition of "employee," the statute defines the term "employer" broadly:

> The term "employer" means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan....

29 U.S.C. § 1002(5); *see also* 29 U.S.C. § 1002(9) (defining "person"). That ERISA expands the concept of "employer" beyond common-law or corporate-law notions is not much in doubt. *See Darden v. Nationwide Mutual Ins. Co.*, 796 F.2d 701, 706 (4th Cir.1986) (in ERISA case, common-law test for master-servant relationship inappropriate for "employee" definition); *cf. Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir.1983) (construing analogous language in Fair Labor Standards Act, 29 U.S.C. § 203(d) similarly). Appellant, we think, fits comfortably within this definitional window. That Kwatcher acted "in the interest of an employer, in relation to an employee benefit plan" when he represented his company in matters concerning the Fund, *e.g.*, negotiations affecting employer contributions, oversight of Astor's payments to the Fund, can hardly be gainsaid.

Moreover, in the Part I context, there are cogent reasons why a sole shareholder should be considered an employer as a matter of "economic reality." We have previously said as much in dicta, *Mass. Laborers' Health & Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 24 (1st Cir. 1988), and now so hold. When an individual dominates the actions of a corporate entity—and who rules the corporate roost more singlehandedly than a sole shareholder doubling in brass as the firm's chief executive and principal operating officer?—it seems fair to acknowledge the actuality of the situation: such an individual assuredly acts "in the interest of" the corporation. He is thus subject to classification as an "employer."[4] *See Alman v. George Mfg. Corp.*, 680 F.Supp. 56, 57 n. 3 (D.Mass.1988) (listing other cases to like effect).

The rest follows inexorably. Once a person has been found to fit within the "employer" integument, ERISA prohibits payments to him from a qualified plan. Under the statute's "anti-inurement" provision (with exceptions not here material):

> [T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

29 U.S.C. § 1103(c)(1). Since Kwatcher is an "employer" under 29 U.S.C. § 1002(5), pension payments to him would "become of advantage to [an] employer," *Amato v. Western Union Int'l, Inc.*, 773 F.2d 1402, 1414 (2d Cir.1985), *cert. dism'd*, 474 U.S. 1113, 106 S.Ct. 1167, 89 L.Ed.2d 288 (1986), thereby violating the law.

### B. *Legislative History.*

As a check upon our reading of the statute, we examine its legislative history and evident purposes. That exercise, we believe, reinforces the meaning which the statutory language suggests. Read fully and in context, ERISA's background demonstrates that the anti-inurement caveat and Part I's expansive definition of "employer" are not mere window-dressing.

ERISA's framers were concerned that employers would exploit, misuse, or loot the huge reserves of funds collected for employee benefit plans. *See, e.g.*, 29 U.S.C. § 1001(a) (congressional finding that

---

**4.** This case does not call upon us to map the frontiers of the realm of "economic reality." However long or short the theorem's reach may eventually prove to be, Kwatcher—who owned all of Astor's stock and served as its main officer —qualified as an employer under any conceivable formulation of the standard. We reserve all other permutations, and the questions inherent therein, to another day.

"owing to the inadequacy of current minimum standards, the soundness and stability of plans ... may be endangered"); H.R. Rep. No. 807, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4670, 4681 (noting continued "abuses in the administration of pension plans and in the handling of pension funds"); S.Rep. No. 383, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4890, 4892 (similar); *id.* at 4903 (acknowledging need "for more effective remedies to prevent misuse of pension funds to the detriment of ... participating employees"). Because retirement plans lacked "adequate safeguards concerning their operation," 29 U.S. C. § 1001(a), Congress determined to curb misconduct by means of certain "[b]asic fiduciary rules." H.R.Conf.Rep. No. 1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 5038, 5083. One such rule embodied the anti-inurement principle. As the Conference Report put it: "Since the assets of the employee benefit plan are to be held for the exclusive benefit of participants and beneficiaries, plan assets generally are not to inure to the benefit of the employer." *Id.*

There was, of course, nothing novel about the suggestion that employers should be excluded from employee benefit plans. ERISA's anti-inurement tenet echoed—and, to some extent, overlapped—section 302 of the Labor–Management Relations Act (LMRA), 29 U.S.C. § 186(c)(5) (requiring that employee benefit plans be "for the sole and exclusive benefit of ... employees"). Like its congenator in ERISA, section 302's exclusive benefit rule was designed "to insure that employer contributions are only for a proper purpose and ... that the benefits from the established fund reach only the proper parties." *Moglia v. Geoghegan*, 403 F.2d 110, 116 (2d Cir.1968), *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453 (1969).

These parallel enactments reflect Congress's desire "to implement trust law notions of the duty of loyalty.... [and thereby] institute a familiar regime to protect pension funds against internal defalcation." Fischel & Langbein, *ERISA's Fundamental Contradiction: The Exclusive Benefit Rule*, 55 U.Chi.L.Rev. 1105, 1109–10 (1988). Because the anti-inurement provision is a prophylactic device with the "intentionally one-sided purpose of protecting employees and protecting the financial integrity of pension plans," *Soft Drink Industry Local Union No. 744 Pension Fund v. Coca-Cola Bottling Co.*, 679 F.Supp. 743, 747 (N.D.Ill.1988), courts must not read its command grudgingly.

All in all, the legislative history leaves little doubt that the anti-inurement rule should be construed to keep as strict a separation as practicable between employers and the funds set aside to benefit employees. That separation, of course, tracks precisely with the grooves of the ERISA statute itself, *see supra* Part II(A), thus bolstering the conclusion that a sole owner of a corporation, like appellant, is an employer (who cannot, therefore, be a plan participant).

### C. *The Regulations.*

Any lingering smudges on the pane of insight vanish when one looks at the regulations adopted by the Secretary of Labor (the Secretary) pursuant to the granted power to prescribe regulations "necessary or appropriate to carry out the provisions" of Part I. 29 U.S.C. § 1135. In defining the term "employee," the regulations state:

> An individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether incorporated or unincorporated, which is wholly owned by the individual or by the individual and his or her spouse....

29 C.F.R. § 2510.3–3(c)(1) (1988). This definition leaves no room to maneuver. By its terms, the regulation unambiguously debars a sole shareholder (such as Kwatcher) from "employee" status, notwithstanding that he may work for the corporation he owns, shoulder to shoulder with eligible (non-owner) employees. Because no amount of mental gymnastics can avoid the plain meaning of the regulation, plaintiff meets it head-on, asserting that it is inconsistent with the statute. But as we read ERISA, the Secretary's decision to ban owner-employees from plan participation

finds ample grounding in both the Act and its legislative history. *See supra* Parts II(A), (B).

When the agency entrusted with the implementation and elucidation of a statute parses it in a way that the resultant interpretation derives its essence from the enabling legislation, we must accord ensuing regulations "considerable weight." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). On judicial review, the question is not whether the rule represents the best possible regulatory choice, but only whether the agency's construction was "reasonable," *id.*, or "reasonably defensible," *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 891, 104 S.Ct. 2803, 2808, 81 L.Ed.2d 732 (1984) (referencing definition of "employee" constructed by National Labor Relations Board), or not "clearly erroneous or inconsistent with the statutory plan." *Massachusetts Dept. of Educ. v. United States Dept. of Educ.*, 837 F.2d 536, 541 (1st Cir.1988). Here, the Secretary's promulgation of section 2510.3–3(c)(1) falls well within the encincture where deference is due. *Accord Schwartz v. Gordon*, 761 F.2d 864, 867–69 (2d Cir. 1985) (Secretary's exclusion of plan established by self-employed individual from ERISA's definition of "employee benefit plan" was consistent with legislative history and not unreasonable); *see generally* Starr, *Judicial Review in the Post–Chevron Era*, 3 Yale J. on Reg. 283, 288 (1986). The regulation must, therefore, be given controlling effect. *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782.

### D. *Policy Considerations.*

Stymied by this asseverational array, appellant tries to find another aperture. Like the Pied Piper, he plays a seductive song. The theme is that application of the anti-inurement rule and the Secretary's regulation to block pensions for owner-operators would disserve Congress's overriding goal of "provid[ing] the maximum degree of protection to working men and women covered by private retirement programs." S.Rep. No. 127, *supra*, 1974 U.S.Code Cong. & Admin.News at 4854. We understand the lyrics, but think the music is out of tune.

Conscious that ERISA would not cover everyone in the workplace, Congress refined and delivered a wide variety of retirement savings options along with the ERISA package. Existing laws were revised in other ways to favor those ineligible for employee pension plans. For example, Congress permitted "any individual who is not an active participant in a qualified or government plan" to make tax-deductible payments to an individual retirement account (IRA), and have his or her employer make similar contributions. *See* H.R.Conf. Rep. No. 1280, *supra*, 1974 U.S.Code Cong. & Admin.News at 5116, 5118. Use of IRAs was particularly encouraged among workers "who are not receiving the advantages of current coverage under qualified retirement plans." H.R.Rep. No. 807, *supra*, 1974 U.S.Code Cong. & Admin.News at 4699. In addition, Congress dramatically increased the maximum deductible payments which self-employed persons could make to so-called "Keogh plans"; permitted self-employed persons to contribute up to $750 per year out of earned income without regard to percentage limitations; and increased the maximum amounts which could be set aside for shareholder-employees of "subchapter S" small business corporations. *See* H.R.Conf.Rep. No. 1280, *supra*, 1974 U.S.Code Cong. & Admin. News at 5113. Collectively, these measures ensured that working proprietors—incorporated or not—could make tax-favored retirement arrangements despite their exclusion from ERISA-qualified pension plans. That these entrepreneurs were not left out in the cold seems directly relevant to the problem of statutory interpretation presented in this case. We agree entirely with the Tenth Circuit that: "The creation and improvement of these [alternative] plans by the passage of ERISA undoubtedly formed the basis for the Secretary of Labor's exclusion of owner-employees and self-employed persons from the operation of employee benefit plans." *Peckham I*, 653 F.2d at 428.

Moreover, the equities of Kwatcher's case are not particularly stirring. Nothing in the record indicates that Kwatcher asked the Fund for a determination of eligibility before contributing. It appears instead that, as a business owner, Kwatcher unilaterally made pension contributions from the corporate coffers to his own behoof. This is quite unlike a situation where an ineligible worker reasonably relied on the pension fund's false representations that he would receive benefits. *Compare Rosen v. Hotel and Restaurant Employees & Bartenders Union*, 637 F.2d 592, 598 (3d Cir.), *cert. denied*, 454 U.S. 898, 102 S.Ct. 398, 70 L.Ed.2d 213 (1981). Any expectations appellant developed must yield both to the strong public interest in keeping a principal ERISA safeguard intact, and to the perhaps prosaic (but still powerful) interest in maintaining the Fund's solvency. "The actuarial soundness of pension funds is, absent extraordinary circumstances, too important to permit trustees to obligate the fund to pay pensions to persons not entitled to them...." *Phillips v. Kennedy*, 542 F.2d 52, 55 n. 8 (8th Cir.1976). *Accord McMartin v. Central States, Southeast and Southwest Areas Pension Fund*, 159 Mich.App. 1, 406 N.W.2d 219, 221 (1987); *see also Thurber v. Western Conference of Teamsters Pension Plan*, 542 F.2d 1106, 1109 (9th Cir.1976) (fund cannot be estopped from denying claimant's eligibility since "[t]he rights of other pensioners must be considered"); *but see Aitken v. IP & GCU–Employer Retirement Fund*, 604 F.2d 1261, 1267–68 (9th Cir.1979).

In this case, Kwatcher was in the best position to monitor his own eligibility. He had access to MCNE's governing councils and supervised Astor's contributions to the Fund. He was fully chargeable with knowledge of ERISA's requirements. No sufficient cause has been shown why the Fund should bear the cost of appellant's mistake. *See McHugh*, 638 F.Supp. at 1047; *Melang v. I.B.E.W. Pacific Coast Pension Fund*, 93 L.R.R.M. (BNA) 2389, 2390 (W.D.Wash.1976).

### E. *The Bottom Line.*

Viewed through whatever glass, the impact of ERISA on dual-status individuals looks the same. The language of Part I, its legislative history, and the appurtenant regulations all reflect the conclusion that sole shareholders are "employers," and therefore cannot be "employees" for purposes of plan participation. The weight of the better-reasoned caselaw is in accord, and the policies which undergird ERISA are more effectively served by such a rule. A destination is not difficult to chart where, as here, all roads lead to Rome. The district court did not err when it granted defendant's motion for *brevis* disposition.[5]

### III. LOOKING BACKWARD

The same reasoning wipes away appellant's claim of entitlement to pension benefits during the period 1934–49. The facts are these. Kwatcher worked for third parties during that interval, but his employers made no contemporaneous funding payments on his behalf. (Indeed, the Fund did not come into existence until 1973.) Rather, Kwatcher's contributions started long after he had climbed the ladder and taken control of Astor. Presumably to maximize current tax deductions and/or ultimate pension benefits, Kwatcher caused Astor to make payments retroactive to the 1934–49 period.[6]

---

5. Because payments to Kwatcher would violate ERISA's anti-inurement rule, we need not decide whether Astor's contributions on Kwatcher's behalf, or Kwatcher's receipt of pension benefits, would also violate the exclusive benefit rule of the LMRA. Courts are divided on the question. *Compare, e.g., Reiherzer v. Shannon*, 581 F.2d 1266, 1275–76 (7th Cir.1978) (29 U.S.C. § 186(c)(5) does not forbid payment of pension benefits to supervisor) *with Melang*, 93 L.R.R.M. at 2390 (benefit payments to individual employer would violate LMRA).

6. We assume this to be the case based upon statements of appellant's counsel at oral argument before us, inasmuch as the record in the district court fails to reflect the nature, timing, or amount of any such retrospective contributions. Although we do not base our decision on it, the absence of documented facts itself afforded an independently sufficient reason justifying rejection of this claim when first raised by plaintiff's motion for reconsideration. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)

We need not belabor the point. All the funding payments—including those labelled as relating to prior periods—were made while Kwatcher was an "employer" within the contemplation of the Act. If an employer is ineligible to receive benefits based upon ordinary pay-as-you-go contributions, then *a fortiori*, he cannot confer eligibility upon himself by buying "coverage" for intervals during which no contemporaneous payments were made. There is no basis for this sort of devil's bargain either in the Plan, *see, e.g.,* Plan § 7.1 ("contributions shall be paid on a timely basis"), or in ERISA, *see, e.g., Thurber,* 542 F.2d at 1109 (unlawful for ERISA-regulated pension fund to receive "retroactive contribution" aimed at healing break in service or to pay benefits "based upon the illegal retroactive contribution"); *see also Curtis v. Noel,* 877 F.2d 159, 162 (1st Cir.1989). It is simply too much of a stretch to posit ERISA liability on these facts: since Kwatcher had no right to receive a pension for the 1934–49 period, the district court cannot be said to have perpetrated a "manifest abuse of discretion" in denying his reconsideration motion. *In re Sun Pipe Line Co.,* 831 F.2d 22, 25 (1st Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

## IV. RESTITUTION: THERE'S THE RUB

The Fund has refused to repay the pension contributions fruitlessly made on Kwatcher's behalf despite the fact that ERISA's anti-inurement rule contains an exception permitting pension plans to reimburse employers when an overcontribution results from "a mistake of fact or law." 29 U.S.C. § 1103(c)(2)(A)(ii). The law provides that the anti-inurement principle "shall not prohibit the return of such contribution or payment to the employer with-

in 6 months after the plan administrator determines that the contribution was made by such a mistake." *Id.* Appellee deems the statute purely permissive, allowing a pension fund to remit employers' mistaken payments when it chooses to do so—but *requiring* no refunds. This view has some support in the caselaw. *See, e.g., Dime Coal Co. v. Combs,* 796 F.2d 394, 400 (11th Cir.1986).

Kwatcher asks that we compel the Fund to return the contributions received on his account. We demur. Such matters are for the district court in the first instance, and in this case, refund rights were mentioned below only in passing.[7] Nevertheless, since both sides have briefed and argued the matter, and the caselaw is in some disarray, we take this opportunity to offer a modicum of guidance on the subject.

### A. *Statutory Rights of Action.*

ERISA does not confer upon employers an explicit right to recover overcontributions. The statute's civil enforcement provision, 29 U.S.C. § 1132(a), empowers only "participants," "beneficiaries," "fiduciaries," and in some instances the Secretary, to seek redress in federal district court for statutory violations. "Employers are conspicuous by their absence." *Soft Drink,* 679 F.Supp. at 747. To this extent, the circuits seem to be in general agreement. *See, e.g., Plucinski v. IAM Nat'l Pension Fund,* 875 F.2d 1052, 1054–1055 No. 88–5352, slip op. at 7 (3d Cir. May 19, 1989); *Dime Coal,* 796 F.2d at 397; *Whitworth Bros. Storage Co. v. Central States, Southeast and Southwest Areas Pension Fund,* 794 F.2d 221, 224–25 (6th Cir.), *cert. denied,* 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986).

Whether ERISA contains an implied private right of action of this genre is a

---

(movant entitled to summary judgment if nonmoving party fails to make a sufficient factual showing as to an essential element of its case); *cf. In re Sun Pipe Line Co.,* 831 F.2d 22, 25 (1st Cir.1987) (describing heavier burden to be borne when legal theory not raised until after opponent's motion allowed), *cert. denied,* — U.S. —, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988).

7. When the district judge granted the Fund's Rule 56 motion, he was careful to write that the judgment did "not mean that the plaintiff is not entitled to a possible recovery in restitution for the payments he has made to the fund." This reference appears to have focused the parties' attention on the issue.

closer question. We believe it does not. More particularly, we do not view an action for return of mistaken contributions as implicit in 29 U.S.C. § 1103(c)(2)(A)(ii). When determining whether to infer private rights of action, the "issue is whether Congress meant to give an injured person a right himself to enforce the federal statute directly against the non-federal person or whether the injured person can do no more than ask the federal government to enforce the statute." *NAACP v. Secretary of HUD*, 817 F.2d 149, 152 (1st Cir.1987). Consequently, "our focus must be on the intent of Congress." *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 535–36, 104 S.Ct. 831, 838, 78 L.Ed.2d 645 (1984). If neither the text nor the legislative history of a statute reveals a congressional intent to create a new class of private plaintiffs, a court's inquiry should proceed no further. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985); *Northwest Airlines, Inc. v. Transport Workers Union of America*, 451 U.S. 77, 94 n. 31, 101 S.Ct. 1571, 1582 n. 31, 67 L.Ed.2d 750 (1981).

So here. In the first place, since Congress has carefully catalogued a selected list of persons eligible to sue under ERISA, there is no plausible rationale for us gratuitously to enlarge the roster. *Cf. Int'l Union of Bricklayers and Allied Craftsmen v. Menard & Co. Masonry Building Contractors*, 619 F.Supp. 1457, 1460–62 (D.R.I. 1985) (fund, as distinct from trustees, cannot sue employer under ERISA to enforce payment obligations). Then, too, the statutory declaration that the anti-inurement rule "shall not prohibit" the return of funds does not command rebating such contributions; it merely expresses an intent to permit, but not require, the trustees to return them. *Plucinski*, 875 F.2d at 1056. The legislative history of section 1103 suggests nothing different. *See* H.R. Conf.Rep. No. 1280, *supra*, 1974 U.S.Code Cong. & Admin.News at 5083 (ERISA "*allows* an employer's contributions to be returned") (emphasis supplied). And, there are considerations which counsel special hesitancy in implying specific causes of action from the text of ERISA:

The six carefully integrated civil enforcement provisions found in [ERISA] ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly. The assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a "comprehensive and reticulated statute."

*Massachusetts Mut. Life*, 473 U.S. at 146, 105 S.Ct. at 3092 (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed. 2d 354 (1980)).

For these reasons, we are convinced that a cause of action in favor of an employer for recovery of overpayments cannot be implied under 29 U.S.C. § 1103. *Accord Plucinski*, 875 F.2d at 1056; *Dime Coal*, 796 F.2d at 398–99; *Whitworth*, 794 F.2d at 228–33; *Soft Drink*, 679 F.Supp. at 745–48; *but see Award Service, Inc. v. Northern California Retail Clerks Unions and Food Employers Joint Pension Trust Fund*, 763 F.2d 1066, 1068–69 (9th Cir. 1985) (finding implied right of action), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 850, 88 L.Ed.2d 890 (1986).

### B. *Federal Common Law.*

■ We recognize that, taken in isolation, the absence of an express or implied right of action for restitution might invite harsh, inequitable results. It is not uncommon for employers erroneously to disburse large sums to employee benefit plans, believing the extra payments mandated by ERISA and/or the plan documents. *See* Note, *Implying a Statutory Right for Employers for the Return of Mistaken Overcontributions to a Multiemployer–Employee Benefit Plan*, 62 Notre Dame L.Rev. 396, 397 & n. 8 (1987) (Notre Dame Note); Note, *An Employer's Implied Cause of Action for Restitution Under Section 403 of ERISA*, 54 Fordham L.Rev. 225, 237 & n. 84 (1985) (Fordham Note). Under the regime urged by appellee, pension funds would be permitted to retain all

such sums. Since there would be no incentive to return mistaken payments voluntarily, the permissive refund mechanism, 29 U.S.C. § 1103(c)(2)(A), would be like a permanently-shut window: decorative, but of no assistance in letting in a breath of fresh air.

We will not lightly assume that Congress intended to enact a self-nullificatory refund provision. We are equally loath to think that Congress meant either to craft a heads-I-win, tails-you-lose matrix, or to institutionalize a one-sided windfall permitting employee-participants to sponge off an employer's good-faith bevues. In the long run, penalizing employers for undercontributing, 29 U.S.C. § 1132(g)(2), while refusing to refund their excess contributions, could frustrate ERISA's goal of expanding pension plan coverage. Manifest inequity is one effective way of discouraging employers from sponsoring ERISA-qualified plans at all. See Plucinski, 875 F.2d at 1057–1058; Soft Drink, 679 F.Supp. at 751; Fordham Note, supra, at 226 & n. 11; see also H.R.Rep. No. 533, supra, 1974 U.S. Code Cong. & Admin.News at 4639 (authors of ERISA "constrained to recognize the voluntary nature of private retirement plans").

The solution, we think, lies in the method of the statute. Whereas ERISA grants no self-executing rights of action in favor of an employer who mistakenly overcontributes, the statute does give the federal courts power to prevent this sort of inequity. By its terms, ERISA "shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). Given the "expansive sweep" of ERISA preemption, Pilot Life, 481 U.S. at 47, 107 S.Ct. at 1553, Congress expected "that a federal common law of rights and obligations under ERISA-regulated plans would develop." Id. at 56, 107 S.Ct. at 1557; accord Burnham v. Guardian Life Ins. Co., 873 F.2d 486, 489 (1st Cir.1989); Whitworth, 794 F.2d at 234–35 (citing cases).

Congress specifically contemplated that federal courts, in the interests of justice, would engage in interstitial lawmaking in ERISA cases in much the same way as the courts fashioned a federal common law of labor relations under section 301 of the LMRA. See Pilot Life, 481 U.S. at 55–56, 107 S.Ct. at 1557 (discussing legislative history). The labor-law model signals flexibility. As the Supreme Court has written in that context:

[Some legal problems] will lie in the penumbra of express statutory mandates. Some will lack express statutory sanction but will be solved by looking at the policy of the legislation and fashioning a remedy that will effectuate that policy. The range of judicial inventiveness will be determined by the nature of the problem. Federal interpretation of federal law will govern, not state law. But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy.

Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 457, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957) (citations omitted). Accord Whitworth, 794 F.2d at 235 (applying Lincoln Mills to illustrate scope of federal common law under ERISA).

We think that the traditional equitable action for restitution is part and parcel of ERISA's federal common law. We therefore rule that federal courts may award restitution to employers in ERISA cases where principles of equity make such an award appropriate. In so doing, we join several courts which have so held. See Plucinski, 875 F.2d at 1057 (recognizing action for "equitable restitution" in employer's favor under federal common law); Whitworth, 794 F.2d at 235–36 (employer may pursue federal common law action for return of payments mistakenly made to multiemployer pension plan); Chase v. Trustees of the Western Conference of Teamsters Pension Trust Fund, 753 F.2d 744, 749 (9th Cir.1985) (similar); Peckham v. Board of Trustees, Etc., 724 F.2d 100, 101 (10th Cir.1983) (Peckham III) (similar); Teamsters Local 639–Employers Health Trust v. Cassidy Trucking, Inc., 646 F.2d 865, 868 (4th Cir.1981) (similar); Airco Industrial Gases v. Teamsters Health and Welfare Pension Fund, 618 F.Supp. 943, 950–51 (D.Del.1985) (similar); E.M. Trucks,

*Inc. v. Central States, Southeast and Southwest Areas Pension Plan,* 517 F.Supp. 1122, 1124 (D.Minn.1981) (similar).

Such an anodyne makes the playing field level for employers and employees; reduces the risk of draconian treatment for those who overpay; and is fully consonant with ERISA's underlying policies as expressed in 29 U.S.C. § 1103(c)(2)(A). Rather than undermining ERISA's remedial scheme, equity supplements it by providing a tool for courts to use when one party "has been unjustly enriched at the expense of another," *Restatement of the Law of Restitution* § 1 (1937); *see also* Fordham Note, *supra,* at 238–45 (all courts considering issue have held that ERISA preempts state law of restitution; federal cause of action is therefore both appropriate and necessary).

The argument that the availability of restitution will endanger pension funds' solvency is easily defenestrated. Unlike lawsuits that seek payment of full retirement benefits, actions for restitution seek only the return of amounts actually paid to, and unjustly retained by, pension funds. No such award can jeopardize the legitimate claims of other contributors, since "participants and beneficiaries are not entitled to funds to which they had no right in the first place." Notre Dame Note, *supra,* at 409. Furthermore, restitution is an equitable action. Recoupment will not follow automatically upon a mere showing that a plaintiff has tendered more than required, but only "when the equities favor it." *Chase,* 753 F.2d at 749. The impact of restitution on a plan's financial stability may certainly be considered.

Because no two sets of circumstances are apt to be identical, we offer no catalog of the many other considerations which will be subject to equitable weighing, save to say that they comprise essentially the type and kind to which chancery courts, historically, have looked in restitutionary actions. The trial court should consider whatever factors it may reasonably believe shed light on the fairness of reimbursement, and weigh those factors against the backdrop of general equitable considerations and the guiding principles and purposes of ERISA. Equity, after all, is meant to be flexible.

To summarize, then, we are of the opinion that recovery of contributions mistakenly made can be attempted under a common-law theory of restitution. On remand, the district court's inquiry should be limited to contributions made subsequent to ERISA's watershed date of January 1, 1975. *See Chase,* 753 F.2d at 750 (refund of contributions made before January 1, 1975 barred because 29 U.S.C. § 1103(c)(2)(A) does not apply retroactively).[8] Should the district court be disposed to honor a restitutionary claim, no interest may be awarded on sums refunded. *See Airco Industrial Gases, Inc. v. Teamsters Health and Welfare Pension Fund,* 850 F.2d 1028, 1037 (3d Cir.1988) (ERISA's anti-inurement principle bars interest on refunds); *Peckham III,* 724 F.2d at 101 (deferring to proposed Treasury Regulation prohibiting refund of earnings attributable to overpayments). We take no view of the identity of the proper refund claimant, leaving that matter in the first instance to the district court.[9]

## V. DRAWING THE CURTAINS

We hold that an individual who owns all of the issued and outstanding stock of a corporate employer is himself an "employ-

---

**8.** We are aware that at least one court has held open the possibility of a return of pre–1975 contributions under state-law principles of restitution. *See McHugh,* 638 F.Supp. at 1048. Whatever the theoretical merits underlying the possibility, we think that any such effort would be foreclosed in this case, given the passage of time.

**9.** We understand that Astor, not Kwatcher, actually made the contributions to the Fund. When a corporation makes payments on an individual's behalf, and the individual is not otherwise entitled to the sums in question, any right to restitution would ordinarily rest with the corporation. In the ERISA context, the problem is complicated by factors such as Kwatcher's statutory role *qua* employer, *see supra* Part II, and the possibility that he might have standing on either a subrogation or third-party beneficiary theory. In fairness to all parties—the Fund, after all, has a right to be protected from duplicative liability in the event restitution is found warranted—these matters are best sorted out in the district court, presumably after Astor has been joined.

er" for purposes of Part I of ERISA. Because an "employer" cannot be an "employee" under ERISA (Part I), a sole shareholder is ineligible to participate in an ERISA-qualified pension plan. The conclusion that appellant's status as Astor's sole shareholder and chief executive officer prevented him from being considered an "employee" or "participant" under ERISA and thus recovering pension benefits, disposes of the principal contention in this case. We therefore affirm the district court's grant of summary judgment in appellee's favor.

Appellant's assertion that he is somehow eligible to receive a partial pension based on the work he performed from 1934 to 1949, *see supra* Part III, is sophistic. Because the contributions in question were made after the fact, from Astor's exchequer, and at a time when Kwatcher dominated the corporation, he cannot receive a stipend. Hence, we affirm the order denying appellant's motion for reconsideration.

But in this case, we need go further. Under federal common law and subject to whatever statutory constraints apply, overpayments to an ERISA-regulated pension fund may be recovered if and when the district court, in its sound discretion, is persuaded that equity would be served. Accordingly, we remand to the district court for further proceedings to determine whether restitution is in order.[10]

*The judgment of the district court and its order refusing to alter or amend the judgment are affirmed. The cause is remanded to the district court for further proceedings consistent with this opinion. Costs will be taxed in favor of appellee.*

---

**10.** We realize that plaintiff did not plead a claim for restitution *per se.* Yet, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in [his] pleadings." Fed.R.Civ.P. 54(c). In this instance, the district court in granting summary judgment specifically raised—and left open—the possibility of restitutionary relief, and the parties in their appellate briefs have argued its potential availability. Thus, we think further proceedings to be appropriate in the interests of justice. *Compare, e.g., Rivera–Gomez v. de Cas-* tro, 843 F.2d 631, 635–36 (1st Cir.1988) (appellate court has power, in interests of justice, after affirming dismissal of complaint, to order consideration of additional theory by district court); *City of Columbia v. Paul N. Howard Co.,* 707 F.2d 338, 341 (8th Cir.) (where district court decided case as a contract matter but did not pass upon tort theory due to counterclaimant's lack of clarity in presentation, amendment would be allowed after remand), *cert. denied,* 464 U.S. 893, 104 S.Ct. 238, 78 L.Ed.2d 229 (1983).