**B + B ELECTRIC CO., INC., Plaintiff,**

v.

**ELECTRICAL WORKERS LOCAL UNION No. 369 RETIREMENT FUND, Defendants.**

No. CIV.A.3:02–CV–1180–H.

United States District Court, W.D. Kentucky, At Louisville.

March 14, 2003.

Thomas W. Miller, Miller, Griffin & Marks, Michael David Meuser, Lexington, KY, for Plaintiff.

Linda J. Wallbaum, Kevin R. Winstead, Sales, Tillman & Wallbaum, Louisville, KY, for Defendant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiff B + B Electric Co. ("B + B") brought this action against Defendant Electrical Workers Local Union No. 369 Retirement Fund ("Fund") to recover overpayments it made to the Fund on behalf of its employees. B + B is a member of the National Electric Contractors' Association and employs electrical workers. The Fund is a multi-employer pension benefit plan as defined in the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1002(2)(A). ERISA and federal common law therefore govern this case. Both parties have filed cross motions for summary judgment on the issue of whether B + B is entitled to a refund.[1]

### I.

In 1996, B + B and the Fund entered into an Inside Agreement through which B + B agreed to pay the Fund 12 percent of each employee's hourly wage. The parties then revised this Agreement in 1999, requiring B + B to pay 13 percent of each hourly wage for the period beginning June 1, 1999 and ending May 31, 2000, and 14 percent beginning June 1, 2000. Pursuant to these Agreements, the Fund contractually agrees to administer B + B's contributions "for the purpose of providing retirement benefits for [Union] Employees and their beneficiaries in accordance with the provisions of the Retirement Plan." In this way, B + B participates in an employee contribution plan run by the Fund by making monthly contributions to a mutually agreed upon bank. B + B also provides the Fund with monthly computer printouts reflecting the name of each Union employee B + B employs, the number

---

1. Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The relevant material facts during this period are not in dispute.

of regular, overtime and double-time hours each employee works, and the gross wages paid to each employee.

This case arises from a series of overpayments B + B made to the Fund between October 1998 and April 2001. Section 6.04 of the Inside Agreements sets the amount B + B is obligated to pay the Fund. It requires that B + B contribute a "pension rate," which is the agreed-upon percentage of the classified *hourly* wage for each hour worked by individual B + B employees. During the period in question, however, B + B mistakenly multiplied the proper pension rate by each employee's *gross* wages. Thus, because gross wages include premiums paid for overtime and double-time, B + B's monthly contributions were more than each employee was entitled to receive.

B + B first discovered this computation error in June 2001 and immediately notified the Fund which agreed to perform a payroll audit from the start of the Fund's 2001 fiscal year, which began September 1, 2000.[2] The audit revealed a $70,273.81 overpayment. As a result, the Fund sent B + B a check for $61,274.71 and stated the remaining $8,999.06 was paid by B + B on behalf of employees who were participants in other funds and, therefore, could not be refunded. The Fund did, however, provide a list of those employees and the amount sent to those funds for each employee. Upon receiving this refund, B + B further inquired as to why the Fund refused to perform an audit for the fiscal

years prior to 2001. B + B says the Fund then explained that it had a policy of denying audit and refund requests unless the request was made within 60 days after the end of the fiscal year in which the overpayment occurred.

On June 27, 2001, the Fund discussed B + B's overpayment at its trustees meeting and authorized an audit for the plan year beginning September, 2000. The Trustees also adopted a Resolution on Refund of Employer Contributions which codified the Fund's longstanding policy with regard to limiting refunds for employer contributions. In short, under this newly codified policy, after an employer submitted a written request, the Fund agreed to return mistaken contributions made by the Employer within the plan year in which the request was made. The written policy was not made effective until September 1, 2000. Significantly, all parties agree that prior to this meeting, there was no written policy regarding contribution refunds.

## II.

■ Section 403(c)(1) of ERISA establishes a general rule that assets of an employee pension plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to plan participants. 29 U.S.C. § 1103(c)(1). One limited exception to this rule, however, permits the refund of overpayments made by an employer to a benefit plan by a mistake of fact or law, if the request is made within six months of when

2. There is some disagreement as to whether B + B followed the Fund's administrative procedure for requesting a contribution refund. Although it appears B + B did not send the Fund the formal written request it required, detailing the individuals for whom the refund was sought, the months in which the overpayment occurred and the correct amount that should have been paid, the Court does not find this failure to be essential to the ultimate resolution of this case. First, B + B, acting

through NECA, did send a formal letter dated June 8, 2001, setting forth that B + B overpaid contributions and requested an audit to verify overpayments. Second, and more importantly, even if B + B had made this request, it does not appear that it would have altered either the Fund's actions, nor this Court's ruling. In any event, the Fund makes this contention in its factual summary but does not argue that it should serve as the basis of its legal defense.

the employer determines the contribution was mistakenly made. 29 U.S.C. § 1103(c)(2)(A)(I)-(ii). Relying on this authority, Plaintiff has brought an action under federal common law for restitution of the mistakenly made payments to the Fund. Although the ERISA language is permissive, allowing but not mandating pension funds to return contributions, the Sixth Circuit clearly permits such a cause of action. *Whitworth Bros. Storage Co. v. Central States, Southeast & Southwest Areas Pension Fund ("Whitworth I")*, 794 F.2d 221 (6th Cir.1986).

■ To prevail on this claim, both sides agree the Sixth Circuit requires that B + B prove the Fund's refund denial "is arbitrary and capricious as measured by equitable principles." *Whitworth Bros. Storage v. Central States S.E. & S.W. Areas Pension Fund ("Whitworth II")*, 982 F.2d 1006, 1018 (6th Cir.1993). In *Whitworth II*, the court further held that "a pension fund's refusal to refund contributions paid by mistake is arbitrary unless retention of the money is necessary to the financial soundness of the plan *or* justified by some other compelling reason." *Id.* at 1017 (emphasis added). The analysis therefore must begin by determining if the Fund has succeeded in proving its decision was not arbitrary by meeting either prong of this test.

■ The Fund argues it has a compelling interest in not issuing a refund because such action would be both highly inequitable and financially destabilizing. As support for this claim, the Fund relies on the fact that it operates a defined contribution plan, as opposed to a defined benefit plan. Contributions are therefore allocated monthly to individual accounts, which are closed and valued at the end of the plan year. Each account is then subject to a pro-ratable allocation of investment gains or losses and administrative expenses. Of particular note, investments are based on all incomes in a prior year and distributed evenly amongst all employees. Annual statements are then sent to participants at the end of the plan year.

Based on this structure, the Fund says it would now be highly inequitable to require refunds for several reasons. First, it argues that the account balances may have already been distributed to some participants and, therefore, the contributions are no longer the Fund's assets. Unfortunately, although agreeing this case is ripe for summary judgment, the Fund provides no evidence of this fact. To the extent there is truth to its conclusory statement, the Fund has not quantified its claim, nor has it provided specific examples. Second, the Fund contends that all participants will be negatively impacted by compelling a refund because investments are calculated based on all employer contributions and evenly divided. Once again, however, the Fund provides no data to support this claim. To the contrary, the only financial information the Court has before it is the $134,714.17 refund B + B now requests, and the Fund's February 28, 2002 asset statement which pegs the Fund's assets at $125,394,537.35. The Court finds it incredibly unlikely that such a comparatively small refund will have dire effects on plan participants who were never entitled to these payments in the first place. Taken together, these arguments simply cannot amount to a compelling interest sufficient to offset the inequities as they currently stand.

Contrary to these two relatively weak arguments, many reasons supported by case law suggest that this is precisely the type of scenario in which the Fund should grant a refund. First and most importantly, there is no evidence that a refund will jeopardize the Fund's financial soundness. *Whitworth II*, 982 F.2d at 1017; *Nat'l Cartage Co. v. Central States*, 24

F.Supp.2d 789, 794 (E.D.Mich.1998) (noting that the court's primary consideration should be the continued financial stability of the fund). True, the Fund reported a $10,000 decrease in its balance between February 28, 2002 and July 31, 2002. But, as B + B notes, such a decrease will still leave the Fund with assets approaching $115,000,000. Moreover, although the Sixth Circuit has suggested that the Fund *must* provide actuarial data to show its potential financial instability, the Court is willing to lower this bar when a defined contribution plan—and not a defined benefit plan—is at issue. Yet despite this concession, the Fund has, again, offered absolutely no financial details which would help the Court hold in its favor on this point. *See Peckham v. Board of Trustees,* 719 F.2d 1063, 1066 (10th Cir.1983) ("The record contains no evidence that the pension fund would be underfunded if the trustees returned plaintiffs' contributions"); *Whitworth II,* 982 F.2d at 1016 (same).

Second, the Fund's refund policy was essentially implemented and applied retroactively. As several courts have noted, such retroactive application is often the "most egregious element" of a deficient refund policy. *Jamail, Inc. v. Carpenters Dist. Council of Houston Pension & Welfare Trusts,* 954 F.2d 299, 305 (5th Cir. 1992); *Nat'l Cartage,* 24 F.Supp.2d at 795; *see also Young America, Inc. v. Union Central Life Ins. Co.,* 101 F.3d 546, 549 (8th Cir.1996). Here, the Fund argues that it has traditionally applied a six-month limitation on refunds and that, in the case of B + B, it was unusually generous in agreeing to provide a refund going back one full year. But however generous the Fund might portend to be, it cannot deny that it failed to put its policy in writing until the June 27, 2001 meeting—nearly a month after B + B notified it of the overpayment. The Fund attempts to circumvent this fact by providing an array of meeting minutes to show it applied this six-month limitation on several previous occasions. Such an argument entirely misses the point. Without a written policy, there was no way for B + B to be on notice that it had a limited time to obtain recovery.

Third, the disparity between the overpayment and underpayment policies also highlights a certain arbitrariness in the Fund's decision. The Fund does not dispute that no limitation governs its recovery for an employer's underpayment. In fact, if the Fund determined that B + B had underpaid for twenty years, it could obtain a full recovery. At a minimum, this certainly suggests that the Fund has the ability to engage in audits, bookkeeping, and make adjustments. Additionally, this different treatment substantially weakens the Fund's assertion that a refund would be inequitable; courts hold that disparities between overpayment and underpayment policies demonstrate inequity which tends to be one more indicia that a refund should be granted. *Jamail,* 954 F.2d at 305 (noting that where employers are granted refunds for only a six months period, but the trust fund performed an audit for itself to collect underpayments every four years, "[j]ustice demands a directly reciprocal limit; recovery of underpayments and refund of overpayments should be possible for an equal period"); *see also Whitworth II,* 982 F.2d at 1014.

In sum, this is essentially an action for restitution: B + B does not seek more than it is owed, it only seeks what the Fund and its participants have unfairly gained and now seeks to keep. As the First Circuit has noted in a similar case, "participants and beneficiaries are not entitled to funds to which they had no right in the first place." *Kwatcher v. Massachusetts Service Employees Pension Fund,* 879 F.2d 957, 967 (1st Cir.1989). For the foregoing reasons, the Court finds

the Fund's decision is arbitrary and capricious because it is based neither on arguments pertaining to financial soundness nor on any other compelling reason as required by the Sixth Circuit.

## III.

■ Next, the Court must consider the question of attorney's fees. As B + B notes, the Sixth Circuit has stated that this language gives substantial discretion to district courts to make awards in ERISA cases. *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801 (6th Cir.2002). B + B relies on 29 U.S.C. § 1132(g) which states that "In any action under this subchapter ... *by a participant, beneficiary, or fiduciary*, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." Importantly, the Sixth Circuit has stated that it is clear an employer, is neither a "participant," 29 U.S.C. § 1002(7), "beneficiary," 29 U.S.C. § 1002(8), or "fiduciary," 29 U.S.C. § 1002(21). *Whitworth*, 794 F.2d at 224. Similarly, allow it has not, B + B could also rely on § 1451(e), which states: "In any action under this section, the court may award all or a portion of the costs and expenses incurred in connection with such action, including reasonable attorney fees, to the prevailing party." This fee-shifting provision, which permits employers to recover, is only applicable to suits involving a determination of employer withdrawal liability from a multiemployer pension plan. On its face, then, ERISA does not appear to allow an employer to recover attorney's fees and costs in connection with a refund action.

■ The question therefore become whether B + B should also be allowed to recover attorney's fees under principles of federal common law. In general, under the "American rule," litigants are responsible for their own attorney's fees. *See Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). Absent a contractual or statutory provision to the contrary, a prevailing party cannot typically recover fees and expenses from a losing party. *Grinnell Bros., Inc. v. Touche Ross & Co.*, 655 F.2d 725, 726 (6th Cir.1981). Inasmuch as ERISA contains no authorization for an award of costs or attorney fees for an employer successful in obtaining a refund and the Sixth Circuit has not held to the contrary, the court sees no reason to deviate from the settled American rule. *See id.* This rule seems to be particularly applicable in this case where the cause of action is one based on equitable principles and, but for the fault of B + B, this refund would be unnecessary. Furthermore, because allowing an attorney's fees award would ultimately unduly punish ERISA plan participants, allowing the award here would yield an unjust result. Accordingly, the court denies the plaintiff's motion for summary judgment insofar as it seeks an award of costs and fees.

## IV.

■ Last, the Court addresses whether interest should be awarded on whatever amounts are refunded.[3] Such a finding would clearly be contrary to prevailing law. Following the rule announced in *Whitworth II*, 982 F.2d at 1020, the Court concludes that interest cannot be awarded. As the Sixth Circuit noted in *Whitworth II*, any interest awarded will come directly from the plan assets and will deprive participants and beneficiaries of its use. *Id.* The Sixth Circuit has further explained that the decision to award restitution is an effort at correcting injustice. *Id.* Thus, payment of interest means an amount

---

3. B + B did not specifically argue this issue, although did request eight percent interest in its sample order. The Court therefore addresses it to avoid any potential confusion.

greater than that owed will be repaid and "could cost the fund more than if the excess contribution had never been made." *Id.; quoting Airco Industrial Gases, Inc. v. Teamsters Health & Welfare Pension Fund,* 850 F.2d 1028, 1037 (3rd Cir.1988). This Court sees no reason to divert from this logic and denies B + B's request for interest.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

The parties have filed cross-motions for summary judgment. The Court has reviewed the evidence and has filed a Memorandum Opinion. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that B + B's motion for summary judgment as to the refund is SUSTAINED and the Fund's motion for summary judgment is DENIED.

IT IS FURTHER ORDERED that within 30 days of entry of this order, the Fund shall do an accounting and promptly thereafter, provide to B + B the results of that accounting and remit to B + B the amount the Fund acknowledges B + B overpaid to it.

IT IS FURTHER ORDERED that to the extent there is a disparity between B + B's accounting and the Fund's accounting, the parties shall notify the Court and a hearing will be set for the Court to make a final determination of the sum owed.

IT IS FURTHER ORDERED that B + B's motion for attorney's fees and costs is DENIED.