**Robert WELSH, Individually and as Administrator of the Estate of Dale H. Welsh, Plaintiffs,**

v.

**QUABBIN TIMBER INC. and Robert Chase, Defendants.**

**Civil Action No. 94–40041–NMG.**

United States District Court,
D. Massachusetts.

Oct. 22, 1996.

John A. Cuejanovich, Springfield, MA, James T. Flaherty, Hartford, CT, for plaintiffs.

Herbert F. Travers, III, Worcester, MA, for Quabbin Timber Inc.

## MEMORANDUM OF DECISION

GORTON, District Judge.

Plaintiff, Robert Welsh ("Welsh"), filed a two-pronged complaint (in several counts) against Quabbin Timber Inc. ("Quabbin") and its President Robert Chase ("Chase"). Prong one alleges that Quabbin and Chase had discriminated against Welsh by denying health care benefits to him and to his wife in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq. ("ERISA"). Prong two alleges that Quabbin wrongfully terminated Welsh's employment in breach of an implied employment contract. After hearing and evaluating the evidence proffered by the parties during a three-day bench trial, this Court finds for the Defendants on all counts.

### I. Findings of Fact

Defendant, Quabbin is a Connecticut corporation with a principal place of business in Rutland, Massachusetts. It is engaged in the business of brokering wholesale hardwood lumber products and was first incorporated in Connecticut in 1989. At that time, Quabbin, Beebe River, Inc. and Woodbine Lumber, Inc. were all subsidiaries of Windham Lumber Company ("Windham"). In late 1989 and early 1990, Windham and its subsidiaries, other than Quabbin, were sold to a group of former employees. That sale eventually precipitated litigation by Robert Welsh Sr., the plaintiff's father ("Welsh Sr.") against the new owners and resulted in the appointment of Welsh Sr. "to operate" Windham. Contemporaneous with the 1989/1990 sale of Windham and its subsidiaries, Quabbin was sold to the plaintiff, Welsh and the

defendant, Chase, and each became 50% stockholders.[1]

At the time Welsh and Chase acquired their stock interests in Quabbin, they understood that Welsh would provide or otherwise obtain necessary financing for the start-up company and Chase would bring to the business an established customer base along with his experience in the hardwood supply business. Chase was listed on the Articles of Incorporation as President and Welsh was listed as Vice President and Treasurer. From its inception, Chase was responsible for the day to day management and operation of the company.

Before the acquisition of Quabbin stock by Welsh and Chase, Windham provided group health insurance coverage to its employees and to the employees of its subsidiaries, including Quabbin, through the National Businessmen's Association. After Quabbin was acquired by Welsh and Chase and until September, 1990, Windham continued to provide group health insurance coverage for Quabbin employees though the same policy.

In September, 1990, Windham purchased a group health and life insurance policy from Metropolitan Life Insurance Company ("Met Life") covering the employees of Windham, its subsidiaries and Quabbin (the "Met Life Group Policy"). Enrolled under that policy were: Welsh Sr., the President of Windham, the plaintiff, Welsh, and defendant, Chase.[2] The premiums for the Met Life Group Policy were paid for by the various subsidiaries and Quabbin according to an employee census list, each subsidiary paying for its own employees.

In 1991, Welsh Sr. formed a new company called Newco to replace Windham. Newco's administrator, Kathy Walden, requested in writing that Met Life transfer the health insurance coverage for certain individuals from their current branches to the new com-

---

1. The nature of the Quabbin entity prior to its 1989 incorporation is unclear from the evidence. Although immaterial to its findings and conclusions, this Court assumes that Quabbin was a division of Windham until 1989 when Welsh and Chase acquired the assets, incorporated in Connecticut and became 50% stockholders.

2. Dale Welsh, plaintiff's late wife, his children and Chase's family were enrolled in the Met Life Group Policy as dependents.

pany. Among those transferred were Welsh Sr. (from Windham to Newco) and Welsh Jr. (from Quabbin to Newco). The notice informed Met Life that the transfers were effective May 1, 1991. On July 15, 1991, Welsh Jr., then living in Florida, filed a Voluntary Petition for protection under the Bankruptcy laws. In his Petition Welsh listed his employer as "Newco Lumber" and his job description as "Administrative Assistant". He did not list Quabbin as an employer.[3]

In early 1990 Welsh, his wife, Dale Welsh, and their son Robert Welsh, III moved to Marco Island, Florida at the suggestion of Welsh's doctor. Having suffered war injuries in Vietnam, it was his doctor's opinion that Welsh needed a warm climate to relieve recurring pain. Although, neither Welsh nor Chase intended for Quabbin to open a Florida office when they incorporated Quabbin in 1989, Welsh did open and operate a Florida branch office of Quabbin after discussions with Chase.[4]

Once the decision to open the Florida office was made, Welsh began receiving weekly checks through Quabbin's payroll account in the gross amount of $700, from which FICA, Federal and State income taxes were withheld. The Florida office of Quabbin operated for about six months and lost approximately $40,000. After it closed, Welsh performed no further significant work for Quabbin. He remained a resident of Florida and relegated his contact with Quabbin to occasional phone conversations with Chase. He also assisted in the attempted collection of one substantial account receivable. There was no evidence that Welsh performed any significant work for Newco at any time.

Welsh retained his 50% stock interest in Quabbin and, after the Florida office closed, he received weekly checks from Quabbin in the gross amount of $250. Welsh continued to receive such checks from Quabbin until November, 1993 when Chase purchased Welsh's 50% stock interest that Welsh had tendered to his Bankruptcy Trustee in July,

1991. The weekly checks were issued in the same form as those issued to all Quabbin employees but the total annual aggregate amount of those checks approximated the year-end bonus that both Chase and Welsh had previously received.

In November, 1990 Dale Welsh ("Dale") was diagnosed with breast cancer and began undergoing treatment for that condition. Dale's medical bills were submitted to Met Life and were paid under the Met Life Group Policy. In September, 1991, the Met Life Group Policy with Windham (then Newco) was renewed for another one-year term. Throughout that term, Dale continued to require at least intermittent care for her cancer. Her medical expenses were submitted to and paid by Met Life under the Met Life Group Policy.

In or about August, 1992, Met Life. informed Newco that in order to continue group health insurance coverage for another year, there would be a substantial increase in premiums. That increase was due in large part, but not exclusively, to the ongoing medical expenses for Dale's treatment. Attending to concerns over the premium increase, Met Life's representative, William Kane ("Kane"), met with Welsh Sr. and Chase at Newco. He also discussed with Welsh, more than once, the increased premium and options available to Newco and Quabbin. At the meeting attended by Kane, Welsh Sr. and Chase, it was acknowledged by all present that, due to Dale's condition, Welsh needed insurance coverage for his family.

Due to the prospective premium increases and the deteriorating financial position of Newco, Welsh Sr. decided to cancel the group health insurance coverage for all employees covered under the Newco policy. The Met Life Group Policy was, therefore, cancelled effective September 22, 1992 and Welsh was left without insurance coverage for Dale's cancer-related medical expenses. Prior to the cancellation of the Met Life Group Policy, Welsh expressed his concern

---

**3.** At trial, Welsh testified that he performed approximately the same functions for Quabbin as he did for Newco.

**4.** The Florida office of Quabbin was opened after Welsh had been living in Florida for four months. At trial, Welsh testified that a motivating factor behind such opening was that he was "bored".

about his wife's condition and about the status of health insurance for his family to his father, Welsh Sr., William Kane of Met Life and James Armstrong, the insurance agent who procured the Met Life Group Policy in 1990.

Beginning in the fall term of 1992, Welsh attended law school in Florida and initially believed that he could obtain relatively inexpensive health insurance as a student through the American Bar Association. Before he did so, however, Welsh exercised his right under the Met Life Group Policy to convert to an individual policy ("Met Life Policy # 1").

Met Life Policy # 1 provided substantially fewer benefits than the Met Life Group Policy and was inadequate for Welsh's needs. While Welsh was in the process of converting to an individual policy from his group policy coverage, William Kane of Met Life provided to Chase at the latter's request a copy of a Florida insurance statute (Fla.Stat.Ann. § 627.648 to 627.6498; Ins.Dept.Rule 4–8.008, the "Florida statute") which created a Catastrophic Risk Pool Plan for Florida residents. Under the Florida statute, Welsh was entitled to convert to an individual plan that covered major medical expenses unavailable under Met Life Policy # 1.

Upon receiving a copy of the statute by fax from Kane on September 9, 1992, Chase immediately faxed it to Welsh in Florida. Thereafter, over a period of several months, Welsh 1) contacted Met Life, 2) requested a review of his rights to individual coverage under the Florida statute and 3) was issued a second individual conversion policy that, like the Met Life Group Policy, covered major medical expenses ("Met Life Policy # 2"). Met Life issued Met Life Policy # 2 with a commencement date retroactive to October 2, 1992.

After Chase faxed a copy of the Florida statute to Welsh on September 9, 1992, Chase began exploring options for coverage of his employees at Quabbin. Sometime after October 2, 1992, Chase received a fax

cover sheet with a handwritten note from Kane which stated in relevant part that

> Bob Welsh exercised his conversion provision on 10/2 ... The Plan, in comparison to most conversion plans, is extremely rich (This is because he resides in FL):
>
> $100 deductible
>
> Plan pays 80% of next $5,000 of Reasonable and Customary charges;
>
> 100% after that
>
> $250,000 Lifetime Maximum Benefit

Sometime during September or early October 1992, Chase became satisfied that adequate, comparable insurance coverage was available to Welsh and his family and that Welsh had chosen to obtain such insurance on his own. At that point, Chase turned his attention to obtaining an insurance plan for Quabbin employees. Shortly thereafter, Chase had a conversation with Deborah Rice, the administrative assistant at Quabbin, concerning Quabbin's efforts to obtain replacement insurance. Addressing Ms. Rice's concerns, Chase informed her that, because Welsh had suitable alternative coverage available, Quabbin's premiums would be substantially less and that therefore a group policy would be more affordable than before.

Through his insurance agent, James Armstrong, Chase explored the possibility of obtaining group health coverage from Met Life and from the John Alden Insurance Company ("John Alden"). On October 15, 1992, Chase obtained a group health plan through a Multiple Employer Trust with John Alden (the "John Alden Policy").[5] The John Alden Policy by its terms (just as the Met Life Group Policy it superseded) covered only full-time employees of Quabbin and defined "full-time" as thirty (30) hours or more per week.

In addition to the Met Life Policy # 2, which Welsh was able to acquire by virtue of his rights under the Florida statute, Welsh purchased a group health plan in April, 1994 through a real estate brokerage firm of which Welsh was a principal. That group health plan covered Welsh and Dale through

---

**5.** A Multiple Employer Trust is an insurance product created to enable employers with few employees to provide group health insurance by pooling the risk associated with their diminutive employee population with that of other similar employers.

Nationwide Insurance Company ("Nationwide"). From October, 1993 through the date of Dale's death, March 29, 1995, her medical bills were submitted for coverage either to Met Life or Nationwide and were paid in accordance with the terms of those policies or by Medicare for which Dale had qualified because of her permanent disability.[6] Prior to late 1993, Welsh made no claim that he or his wife was entitled to insurance coverage under the John Alden Policy purchased by Quabbin.

## II. Conclusions of Law

Prong one of Plaintiff's claim, embodied in Counts I, II and III, alleges that Defendants violated 29 U.S.C. § 1001, et seq., the Employee Retirement Income Security Act, commonly known as ERISA, by not allowing him and his wife to participate in the John Alden Policy. Prong two of the complaint alleges that Quabbin breached an implied contract for employment when it cut off weekly payments to Welsh in late, 1993. The two prongs will be dealt with in sequence.

### A. The ERISA Claim

In order to prove liability of the defendants under ERISA, the plaintiff must first clear certain definitional hurdles placed in his path by the statute.

#### 1. Employee Welfare Benefit Plan

█ As a threshold question with respect to the ERISA counts, plaintiff's claim depends upon whether the John Alden Policy qualifies as an "employee welfare benefit plan" as that term is defined under ERISA. An "employee welfare benefit plan" includes any plan or program established or maintained by an employer for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, medical, surgical, or hospital care benefits. 29 U.S.C. § 1002(1). To be a plan controlled by ERISA, the "plan" must therefore be:

(1) a plan, fund or program; (2) established or maintained; (3) by an employer or an employee organization or by both; (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, unemployment, or vacation benefits (5) to participants or their beneficiaries.

*Kelly v. Blue Cross & Blue Shield of Rhode Island*, 814 F.Supp. 220, 224 (D.R.I.1993) (quoting *Wickman v. Northwestern Nat'l Insurance Company*, 908 F.2d 1077, 1082 (1st Cir.1990)).

█ A "plan, fund or program" under ERISA is established if from the surrounding circumstances a reasonable person can ascertain the intended benefit, the class of beneficiaries, the source of financing, and the procedures for receiving benefits. *Wickman*, 908 F.2d at 1082. The crucial factor in determining whether a "plan" has been established by the purchase of an insurance policy is the intent of the employer. An expressed intention by an employer to provide benefits on a regular and long term basis which can be established by circumstances tending to create an anticipation that the furnishing of health care benefits will continue is enough to constitute a "plan". *Id.* at 1083; *Kelly*, 814 F.Supp. at 225.

█ The employees of Quabbin had been covered under a group insurance plan since September, 1990 when Windham purchased the Met Life Group Policy. The Quabbin employees continued to be covered under the Met Life Group Policy until September 22, 1992 when Welsh Sr. cancelled it. Effective October 15, 1992 Quabbin, through its President, Robert Chase, secured coverage for its employees through John Alden. From that date until the date of trial, Quabbin maintained the John Alden Policy for its employees. Based upon those circumstances, this Court concludes that the John Alden Policy was clearly an "employee welfare benefit plan" as that term is defined ERISA (29 U.S.C., § 1002(1)) and interpreted by caselaw cited above.

---

6. Although this Court does not reach the issue of damages because of its judgment for defendants, it notes that plaintiff has failed to prove quantifiable damages with any sort of clarity. Nor has plaintiff delineated or otherwise suggested a process whereby this court could reasonably determine damages.

### 2. *"Employee"*, *"Participant"* *and/or* *"Beneficiary"*

Having convinced the Court that the John Alden Policy was an "employee welfare benefit plan", Plaintiff must next prove that he was a "participant" or "beneficiary" in that plan.[7]

A "participant" under an ERISA plan as that term is defined in 29 U.S.C., § 1002(7), is:

> any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

If Welsh was an "employee" as that term is used in § 1002(7), he has a potentially viable claim under ERISA. Thus, the next essential determination for the Court to make is whether, for the purposes of ERISA, Welsh was an "employee". If he was not an "employee" then he could not have been a "participant" under a qualified employee welfare benefit plan, Dale could not have been a "beneficiary" and Welsh's ERISA claims fail.

█ "Employee" is defined by § 1002(6) of ERISA as "any individual employed by an employer". Congress intended that definition to encompass those persons "who ha[ve] the status of an 'employee' under a collective bargaining agreement." H.R.Rep. No. 533, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News at 4639, 4648. Referring to the legislative history of ERISA, the First Circuit stated that "[g]iven conventional labor-law principles, that refinement of the 'employee' rubric seemingly excludes management figures." *Kwatcher v. Massachusetts Service Employees Pension Fund*, 879 F.2d 957, 960 (1st Cir.1989). See generally *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974).

The term "employer" is defined by 29 U.S.C. § 1002(5) as "any person acting directly as an employer, or indirectly in the interest of an employer ..." The First Circuit has interpreted the definitions of "employee" and "employer" as two distinct concepts. In *Kwatcher* the Court stated that " 'employee' and 'employer' are plainly meant to be separate animals; under Part I, the twain shall never meet." *Kwatcher* 879 F.2d at 959.[8]

#### a. *The Economic Reality Test*

█ In determining whether a person is an "employee" or "employer", the First Circuit has adopted the "economic reality test" which, even prior to *Kwatcher*, had been the practice in this District.[9] The "economic reality test" looks at the role an individual assumes in the company as well as the investment that he or she makes. The investment may be comprised of capital and guidance given in the interest of the company's success or human labor expended in the interest of receiving compensation in the form of a paycheck. If, in reality, one is an employer, he cannot for purposes of ERISA be treated as an employee also.

In *Mass. Laborers' Health & Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 24 (1st Cir.1988) the First Circuit noted the similarity of the language in ERISA

---

7. Each of the civil enforcement provisions of ERISA upon which the plaintiff's claims are premised requires that the claimant be a "participant" or "beneficiary" of an employee welfare benefit plan. Section 1132(a)(1) states that "a civil action may be brought by a participant or beneficiary ...", and Section 1140 makes unlawful certain actions [e.g. discrimination] by any person towards a "participant or beneficiary".

8. Part I of ERISA, 29 U.S.C. §§ 1001–1168, includes all of ERISA's provisions regarding reporting, disclosure, participation, funding and fiduciary responsibilities and is the part of ERISA with which the Court is here concerned.

9. The First Circuit adopted the "economic reality" test for determining the employee/employer distinction as it applies to ERISA in dicta in *Mass. Laborers' Health & Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 24 (1st Cir.1988) and in the holding in *Kwatcher*, 879 F.2d at 960. In so doing, it confirmed the district courts that had previously decided the issue. See, *Trustees of Amalgamated Insurance Fund v. Danin*, 648 F.Supp. 1142, 1147 (D.Mass.1986); *Rubenstein v. Tri–State Transport, Inc.*, 646 F.Supp. 1, 2 (D.Mass.1984).

§ 1002(5) and in § 3(d) of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 203(d) (1982). The Court concluded that such similarity warranted like treatment in forming the definitive boundaries of the meaning of "employer". It reasoned that the First Circuit, as well as other circuits, had consistently interpreted the word "employer" broadly to impose personal liability for minimum wage payments upon a corporation's "chief executive officer/major shareholder".[10] *Id.* The consequence of interpreting "employer" broadly, when evaluating the status of an individual who is both an owner/officer and a nominal employee, is to interpret "employee" narrowly. By narrowing the class of persons eligible to receive protection as "employees" under an "employee welfare benefit program", Congress made a concerted effort to avoid providing ERISA protection to employers who also perform employee functions. *Kelly,* 814 F.Supp. at 228.

#### b. *The Common Law of Agency Test*

The Supreme Court of the United States has, however, cautioned against reliance on the textual symmetry of FLSA and ERISA when construing the meaning of "employee" under ERISA. *Nationwide Mutual Insurance Company v. Darden,* 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992). In *Nationwide,* the Supreme Court held that ERISA's definition of "employee" as "any individual employed by an employer," 29 U.S.C. § 1002(6),

is completely circular and explains nothing ... and we do not find, any provision either giving specific guidance on the term's meaning or suggesting that construing it to incorporate traditional agency law principles would thwart the congressional design or lead to absurd results. Thus, we adopt a common-law test for determining who qualifies as an "employee" under ERISA.

503 U.S. at 323, 112 S.Ct. at 1348 (citing *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 740, 109 S.Ct. 2166, 2172–73, 104 L.Ed.2d 811 (1989)). Specifically, the Court held that,

[i]n determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the [company objective] is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Nationwide,* 503 U.S. at 323–24, 112 S.Ct. at 1348. Because this common-law test contains "no shorthand formula or magic phrase that can be applied to find the answer, ... all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Nationwide,* 503 U.S. at 324, 112 S.Ct. at 1349, (quoting *NLRB v. United Ins. Co. of America,* 390 U.S. 254, 258, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968)).

#### c. *The Application of Both Tests to the Facts of the Case*

After application of the *Nationwide* "laundry list" to Welsh's relationship with Quabbin, this Court concludes that he was an "employer", not an "employee". Although Welsh was carried on the payroll of Quabbin after 1990, his weekly checks in the gross

---

**10.** *See Falk v. Brennan,* 414 U.S. 190, 195, 94 S.Ct. 427, 431, 38 L.Ed.2d 406 (1973) (apartment managing company is "employer" of apartment workers under FLSA); *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936–37, 6 L.Ed.2d 100 (1961) (knitted goods cooperative is, according to "economic reality," an "employer" under FSLA); *Donovan v. Agnew,*

712 F.2d 1509, 1510–11 (1st Cir.1983) (corporate officers with significant ownership interests are personally liable for bankrupt corporation's FLSA liability) (citing *Hodgson v. Royal Crown Bottling Co.,* 324 F.Supp. 342, 347 (N.D.Miss. 1970) (president of corporation who owns 50% of its stock is proper defendant to FLSA injunction), *aff'd,* 465 F.2d 473 (5th Cir.1972).

amount of $250 were intended to constitute a year-end bonus that Welsh and Chase had previously taken as equal owners of Quabbin. It was Welsh who requested that he be paid in weekly installments rather than with one annual payment. His weekly checks were increased to $700 directly preceding and during his operation of the Florida branch office of Quabbin. When the Florida office closed, Welsh's gross payments were reduced again to $250 per week.

Welsh was an original incorporator of Quabbin. He signed the Articles of Incorporation as Vice President and Treasurer. From Quabbin's incorporation in 1989 until Welsh's bankruptcy in July, 1991, Welsh held an unencumbered 50% of the stock of Quabbin. For a six-month period in 1990, Welsh operated the Florida Division of Quabbin and performed duties similar to Chase's duties in the main office in Rutland, Massachusetts, i.e. he was responsible for the day-to-day operations. Welsh worked when and as long as he pleased. The Florida office of Quabbin incurred substantial losses ($40,000) during its brief existence. Thereafter, Welsh's only contact with Quabbin was through infrequent telephone conversations with Chase.

Plaintiff argues that he was an "employee", as that term is used in ERISA, and therefore a qualified "participant" in an "employee welfare benefit plan", but the facts belie the claim. Although, for a six-month period (while he operated the Florida Office), Welsh assumed the dual status of owner/officer and active employee, relevant caselaw makes it clear that such a status defines "employer" under ERISA § 1002(5) and not "employee" under § 1002(6). *Kwatcher*, 879 F.2d 957.

The "economic reality" of the Welsh's involvement with Quabbin makes it clear that he, like Chase, is not one who Congress intended to protect when it enacted ERISA. Although the ERISA definition of employee as, "any individual employed by an employer," 29 U.S.C. § 1002(6), sheds little light on the issue, the First Circuit, as well as a clear majority of the other circuits, have explicitly held that the same individual cannot be treated as both an employee and employer for ERISA purposes. *Kwatcher*, 879 F.2d at 959; *Meredith v. Time Ins. Co.*, 980 F.2d 352

(5th Cir.1993) (under ERISA, owner of business cannot simultaneously be employer and employee); *Fugarino v. Hartford Life & Accident Ins. Co.*, 969 F.2d 178 (6th Cir.1992) (sole proprietor is employer rather than employee); *Giardono v. Jones*, 867 F.2d 409, 411 (7th Cir.1989) ("employer cannot ordinarily be an employee or a participant under ERISA"); *Peckham v. Board of Trustees of Intern. Broth. of Painters and Allied Trades Union*, 653 F.2d 424 (10th Cir.1981) (sole proprietors precluded from dual status as employer-employee under ERISA). *But see Madonia v. Blue Cross & Blue Shield of Virginia*, 11 F.3d 444 (4th Cir.1993) (contra).

■ Welsh was an absentee, 50% owner/officer of Quabbin after the Florida office shut down. Therefore, whether this Court applies the "economic reality" test adopted by the First Circuit or the common law test more recently enunciated by the Supreme Court in *Nationwide*, the result with respect to Welsh's status is the same: Plaintiff was not an "employee" under ERISA § 1002(6). Because Plaintiff was an "employer" and not an "employee" as those terms are defined under ERISA and relevant precedent, Plaintiff was not a "participant" of an "employee welfare benefit plan" as that term is defined in 29 U.S.C. § 1002(7). Therefore, Welsh's claim of discrimination under still other provisions of ERISA (29 U.S.C. §§ 1132(a)(1) and 1140) fails for, among other reasons, lack of standing under ERISA.

### 3. *Specific Intent to Discriminate*

Although this Court's opinion rests on its conclusion that Welsh was not an "employee", we proceed to consideration of the issue of discrimination both because it affords an alternative ground for its decision and for the sake of completeness. Even if Welsh were found to have been an employee for ERISA purposes, his claim of discrimination against Quabbin and Chase as a fiduciary would fail. That is so because at trial Welsh failed to prove that defendants specifically intended to discriminate against Plaintiff when they secured the John Alden Policy for Quabbin's employees.

### a. *Robert Chase as a Fiduciary*

■ As a threshold matter, this Court agrees with Plaintiff's contention that Chase was a "fiduciary" of the "employee welfare benefit plan" which the John Alden Policy has been found to be. Chase, as president of Quabbin, authorized the direct payment of health insurance premiums to Met Life to maintain the Met Life Group Policy under Windham and later Newco. Thereafter, when Windham could no longer afford to maintain the Met Life Group Policy, Chase undertook to secure health insurance for the Quabbin employees. He met with William Kane of Met Life and the insurance agent, James Armstrong, before deciding to obtain the John Alden Policy through a Multiple Employer Trust.

■ As defined by ERISA, a fiduciary is a person who (or an entity which) exercises discretionary authority or control with respect to managing the plan or has discretionary authority or responsibility in administration of the plan. 29 U.S.C. § 1002(21)(A). Officers of a company which sponsors a plan are themselves fiduciaries to the extent they retain authority for selection and retention of plan fiduciaries because, to that extent, they have retained discretionary authority or control with respect to management of the plan. *Shaw v. IAM Pension Plan,* 563 F.Supp. 653, 657 (C.D.Cal.1983), *aff'd,* 750 F.2d 1458 (9th Cir.1985), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985); *Leigh v. Engle,* 727 F.2d 113, 133–35 (7th Cir.1984) (corporate officer a fiduciary to the extent he controls selection or termination of fiduciaries); *Shaw v. IAM Pension Plan,* 563 F.Supp. 653, 657 (C.D.Cal.1983) (corporate officers are fiduciaries to the extent they hire and fire trustees).

Chase, as President of Quabbin, chose the health insurance policy Quabbin provided for its employees and the specific benefits to be provided within that plan. He chose to participate in a Multiple Employer Trust administered by John Alden, and his authority and exercise of discretion fits squarely within the definition of fiduciary as that term is defined and interpreted under ERISA, 29 U.S.C. § 1002(21)(A).

### b. *No Proof of Discrimination*

Notwithstanding the fact that Chase was clearly a fiduciary, he did not discriminate against Plaintiff in violation of the protections afforded by ERISA. Even if Plaintiff were a bona fide "employee" under ERISA and therefore a qualified "participant" in an "employee welfare benefit plan", which the Court has determined he was not, this Court concludes that defendants Chase and Quabbin did not discriminate against him in violation of § 1140 of ERISA. That section prohibits employer conduct taken against an employee who participates in a pension benefit plan for "the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140.

■ The ultimate inquiry in such a case is whether the employment action was taken with the *specific intent* of interfering with the employee's ERISA benefits. *Barbour v. Dynamics Research Corporation,* 63 F.3d 32, 37 (1st Cir.1995). This "specific intent" requirement derives from the language of ERISA ("for the purpose of interfering") and is necessary

> to separate the firings which have an incidental, albeit important, effect on an employee's rights ... from the actionable firings, in which the effect of the firing on the employer's ... obligation was a motivating factor.

*Id.* (quoting *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1111 (2d Cir.1988). Thus, no ERISA cause of action will lie where the loss of benefits was a mere consequence of, but not a motivating factor behind, a termination of employment or, in our case, an exclusion from coverage. *Id.*

Here Welsh does not allege that Defendants fired him with the specific intent to discontinue his coverage under an ERISA qualified "employee welfare benefit plan", even though he alleges a common law claim for breach of an implied employment contract which will be addressed *infra.* Rather, in the first prong of his complaint, Plaintiff alleges that the defendants discriminated against him by not allowing him to participate in the John Alden Policy which Chase

and Quabbin obtained after Welsh Sr. cancelled the Met Life Group Policy.

■■■ Congress enacted § 1140 of ERISA primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights," *Gavalik v. Continental Can Company,* 812 F.2d 834, 851 (3d Cir.1987). Where the issue is participation in a health insurance plan unaccompanied by a prototypical "firing", the Plaintiff bears the same burden of proving, by a preponderance of the evidence, that an employer acted with the specific intent to discriminate when claiming a violation of § 1140.

■■■ Given that the employer controls the evidence related to intent, in most cases analogous to the case at bar, a plaintiff will be unable to adduce "smoking gun" evidence that the employer intended to interfere with his or her benefits. An employer is unlikely to document such a motive, and there is rarely "eyewitness testimony as to the employer's mental processes." *Dister,* 859 F.2d at 1112 (quoting *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)). Usually, a plaintiff must rely upon circumstantial evidence to prove his or her case. Accordingly, the First Circuit, as well as a number of other circuits, have employed the burden shifting analysis used in Title VII employment discrimination cases to assist the trial judge in determining the ultimate question in the case: whether the defendant discriminated against the plaintiff. *Barbour,* 63 F.3d at 37.[11]

■■■ In order to establish a *prima facie* case of discrimination, a plaintiff must present sufficient evidence from which the employer's specific intent to interfere with the plaintiff's benefits can be inferred. *Barbour,* 63 F.3d at 38. Thus, a plaintiff must show that he or she (1) is entitled to ERISA's protection, (2) was qualified for the position, and (3) was denied benefits under circumstances that give rise to an inference of

discrimination. *Id.* As in the Title VII context, the plaintiff's burden of proof at this stage is *de minimis. Id.*

■■■ Assuming *arguendo* (and contrary to the finding of this Court) that Welsh was an "employee" as discussed *supra,* he has met his initial *de minimis* burden of showing intent on the part of his employer to interfere with his ERISA rights. After the Met Life Group Policy was cancelled by Welsh Sr. on September 22, 1996, Chase obtained a group health insurance policy with John Alden on October 15, 1992. The John Alden Policy did not provide coverage for Welsh. Because the plaintiff's burden at the *prima facie* stage is *de minimis,* these circumstances are sufficient to give rise to an inference that Defendants obtained the John Alden Policy with the specific intent to exclude him. *See Dister,* 859 F.2d at 1114 (plaintiff's discharge four months before certain pension benefits were due to vest, together with the substantial cost savings to the employer in denying pension benefits, were sufficient to raise an inference of specific intent at the *prima facie* stage).

■■■ Once the plaintiff establishes a *prima facie* case, a presumption arises that the defendant acted unlawfully in denying ERISA benefits to the plaintiff. *Barbour,* 63 F.3d at 38. In Title VII cases, such a presumption:

> places upon the defendant the burden of producing an explanation to rebut the prima facie case—i.e., the burden of producing evidence that the adverse employment actions were taken for a legitimate, nondiscriminatory reason;

*Udo v. Tomes,* 54 F.3d 9, 12 (1st Cir.1995) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (Title VII)). That burden remains the same in the ERISA context. *Dister,* 859 F.2d at 1115. Thus, the defendant must establish a legitimate, non-discriminatory reason, i.e. one unrelated to the plaintiff's entitlement to ERISA benefits, for its actions toward the plaintiff.

---

11. *Humphreys v. Bellaire Corp.,* 966 F.2d 1037 (6th Cir.1992); *Rath v. Selection Research, Inc.,* 978 F.2d 1087 (8th Cir.1992); *Conkwright v.* *Westinghouse Elec. Corp.,* 933 F.2d 231 (4th Cir. 1991); *Dister,* 859 F.2d at 1108; *Gavalik,* at 834.

Chase and Quabbin claim that they only acquired the group health insurance policy with John Alden after they were assured that coverage under an alternative policy was available to the plaintiff.[12] For support, defendants submitted a series of faxes from William Kane of Met Life to Chase at Quabbin. As this Court has found, Kane sent Chase a fax on September 9, 1992 accompanied by the Florida statute which created a Catastrophic Risk Pool Plan for Florida Residents. At that time, Welsh was attending law school in and was a resident of Florida. On that same day, Chase sent a copy of the Florida statute to Welsh in Florida. Sometime thereafter, Welsh exercised his conversion rights under the Florida Statute and obtained Met Life Policy # 2 covering the major medical expenses that Welsh and his wife sought.

■ The undated fax from William Kane to Chase, which referred to the health insurance policy that Welsh obtained on "10/2/[92]" informed Chase that Welsh, consistent with his rights under the Florida statute, had obtained medical coverage with a 20% co-payment requirement and a $100 deductible.[13] That information confirmed what Chase had already reasonably assumed from his discussions with Welsh, Kane, Armstrong, and Welsh Sr., namely, that 1) comparable coverage was available to Welsh and 2) Welsh had decided to pursue such coverage on his own. Based upon such evidence, the defendants have met their burden of production.

■ Once the defendant has met its burden of production, the presumption of wrongful intent established by the plaintiff's *prima facie* case "drops out of the picture." *Hicks,* 509 U.S. at 511, 113 S.Ct. at 2749. The burden of production then shifts back to the plaintiff, who must prove that the defendant acted with the specific intent of interfering with the plaintiff's benefits. *Id.* The plaintiff therefore must introduce evidence sufficient to show that the employer's explanation

for its actions is pretextual and that the true reason for its actions was to interfere with the plaintiff's receipt of benefits. *Udo,* 54 F.3d at 13 (citing *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 16 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995)).

Plaintiff's argument that Chase acted with specific intent to deprive him of ERISA benefits is based substantially upon 1) his account of a conversation between Chase and Deborah Rice and 2) his testimony that Chase made it clear to him that he would not be allowed to participate in any plan that Quabbin obtained. This Court has found, however, that Chase made no such prohibitive or discriminatory statements.

### 1. *The Chase/Rice Conversation*

■ The conversation between Chase and Deborah Rice at issue occurred at the Quabbin office in Rutland, Massachusetts. It concerned Quabbin's efforts to obtain replacement health care insurance for its employees after the cancellation of the Met Life Group Policy through Windham/Newco. Having recently encountered costly complications with her pregnancy which were covered by the Met Life Group Policy, Ms. Rice, the administrative assistant at Quabbin, asked Chase about a matter of obvious import and concern to her. Chase responded that, because suitable alternative coverage was available to Welsh, a group policy for Quabbin would be more affordable and the premiums to each employee would be reduced. Such a policy was subsequently obtained through the John Alden Multiple Employer Trust. Taken in context, the testimony of Ms. Rice and Chase were credible and this Court therefore concludes that the statements made by Chase about the John Alden Policy are not evidence of a specific intent to discriminate against Welsh.

### 2. *The Chase/Welsh Conversation*

The second contention that Plaintiff made at trial pertaining to the defendants' specific

---

**12.** At trial, Chase testified that Welsh was his main concern, that he was well aware of Welsh's situation with respect to Dale's cancer and only secured coverage with John Alden after he was assured that Welsh would be protected.

**13.** The John Alden Policy also had a 20% co-payment requirement and a $250–per–year deductible.

intent was that Chase told him in no uncertain terms that he would not be allowed to participate in any plan that Quabbin obtained after the cancellation of the Met Life Group Policy. The testimony of William Kane, which this Court found to be objective and unbiased, and the testimony of Chase, which this Court found to be credible, were persuasive in rebuttal. Their testimony made it clear that Chase, Kane and James Armstrong, Quabbin's insurance agent, explored all reasonable options for health insurance coverage for the company. Among those options were policies with various deductibles, co-payments and lifetime maximum benefits and policies that included, and did not include, coverage of Welsh. Whether Quabbin could have afforded a policy that covered Plaintiff is unclear, but this Court is convinced, in any event, that Chase did not tell Welsh that under no circumstances could he participate in any new health care plan.

Even if Plaintiff were to have qualified as an "employee" for ERISA purposes, as that term is defined in 29 U.S.C. § 1002(6) and had therefore been a "participant" in an "employee welfare benefit plan", he has failed to produce evidence sufficient to rebut Defendants non-discriminatory explanation of their reasons for securing a replacement policy without coverage for the Plaintiff. Consequently, the plaintiff has failed to show, by a preponderance of the evidence, that Defendants acted with the requisite specific intent to discriminate against him in obtaining the John Alden Policy.

## B. *Wrongful Termination of Employment*

Prong two of Plaintiff's complaint against Quabbin alleges (in Count IV) that Quabbin breached an implied contract for employment when it stopped making weekly payments to Plaintiff in November, 1993. The Court concludes that the plaintiff has failed to prove, by a preponderance of the evidence, that there existed an implied contract of employment with Quabbin for the reasons set forth below.

The validity of Plaintiff's breach of contract claim rests on two opposing bodies of evidence: 1) Plaintiff's testimony that Chase told him in 1989 that he wanted to be "partners for life", and 2) Defendants' assertion that any employment arrangement between Welsh and Quabbin was "at will".

## 1. *Partners for Life*

■ Concerning the alleged "partners for life" conversation, this Court concludes that, although such a statement may have been made by Chase and intended to solicit a 50–50 ownership arrangement at the time of Quabbin's incorporation, the sum total of the conversation falls well short of a legally binding commitment for lifetime employment. *O'Brien v. Analog Devices, Inc.*, 34 Mass. App.Ct. 905, 606 N.E.2d 937 (1993) (a finding of a lifetime employment contract demands particularly explicit expressions of intent). Welsh's argument poignantly illustrates the observation of Mr. Justice Holmes in *Deming v. Darling*, 148 Mass. 504, 506, 20 N.E. 107 (1889), about "how easily and insensibly words of hope or expectation are converted by an interested memory into statements of quality and value when the expectation has been disappointed."

## 2. *At Will Employment*

With respect to the status of the employment relationship, this Court concludes that while Quabbin's Florida office was in operation in 1990, Welsh was certainly an employee as well as a 50% owner of the company.[14] Nonetheless, the employment relationship that existed was an "at will" relationship, meaning that either Quabbin or Welsh was free to terminate it at any time without cause for any reason or for no reason at all except for a reason proscribed by statute or public policy. *Wright v. Shriners Hospital for Crippled Children*, 412 Mass. 469, 472, 589 N.E.2d 1241 (1992); *Richey v. American Automobile Association*, 380 Mass. 835, 839, 406 N.E.2d 675 (1980) (observing that even where the discharge of an employee is "bad,

---

14. As discussed *supra*, "employee," is narrowly defined for the purpose of invoking ERISA protection. With respect to a common law breach of contract claim, however, one may be an "em-

ployer" under both the *Kwatcher* and *Nationwide* tests yet remain an "employee" under an employment contract.

unjust, and unkind" the employee is not entitled to relief). Plaintiff has failed to sustain his burden of proving, by a preponderance of the evidence, that his employment agreement with Quabbin was anything other than an at will employment agreement.

 Moreover, it is well settled that an at will employee can recover damages against a discharging employer only upon demonstration that the employee was deprived of compensation for work actually performed for the employer. *McCone v. New England Telephone & Telegraph Co.,* 393 Mass. 231, 233–234, 471 N.E.2d 47 (1984). On Plaintiff's implied contract claim, even if it were found that Welsh had been wrongfully discharged from his at will employment, his recovery would be limited to earned but unpaid wages accrued as of the date of discharge. FLSA, 29 U.S.C., § 201; M.G.L. c. 149, § 148.

As is described above, Plaintiff was paid a weekly gross salary of $700 while the Florida office of Quabbin was open. After the Florida office closed, Plaintiff received a weekly check for $250, the annual, accumulated total of which approximated the year-end bonus he had traditionally received as a 50% stockholder of Quabbin. Quabbin, through Chase, stopped sending Plaintiff his weekly checks for $250 only after Chase acquired Plaintiff's Quabbin Stock from Robert Welsh Sr. via the Bankruptcy Trustee in November, 1993. Plaintiff offered no evidence of any compensable employment services performed for Quabbin after the close of the Florida office. In fact, by Welsh's own testimony he helped on only one account receivable collection and made only occasional phone calls to Chase after 1990. Consequently, this Court concludes that there was no breach of an implied employment contract, and even if there had been, plaintiff proved no damages flowing therefrom.

### CONCLUSION

For the foregoing reasons, this Court concludes that Plaintiff, Robert Welsh, Jr., was not discriminated against in violation of ERISA and that the defendants did not breach an implied contract for employment. Judgment will be entered in favor of the defendants and Plaintiff's claims are, therefore, dismissed.

IT IS SO ORDERED.