**In re Stephan Jay LAWRENCE, Debtor.**

**Bankruptcy No. 97–14687–BKC–AJC.**

United States Bankruptcy Court, S.D. Florida.

July 2, 1999.

Robert A. Stok, Rosenthal Rosenthal Rasco Stok & Wolf, Aventura, FL, for debtor.

Paul Steven Singerman, James H. Fierberg, Berger Davis & Singerman, Miami, FL, for trustee.

***ORDER GRANTING MOTION FOR PARTIAL SUMMARY JUDGMENT ON TRUSTEE'S OBJECTION TO DEBTOR'S CLAIMED EXEMPTION AND MOTION FOR TURNOVER OF PENSION FUNDS AND FOR AN ACCOUNTING AGAINST DEFENDANT STEPHAN JAY LAWRENCE AND DENYING DEBTOR'S MOTION FOR SUMMARY JUDGMENT***

THOMAS S. UTSCHIG, Bankruptcy Judge.

On November 30, 1998, the Court heard both the Chapter 7 trustee's motion for

partial summary judgment on trustee's objection to debtor's claimed exemption and motion for turnover of pension funds and for an accounting against defendant Stephan Jay Lawrence (the "trustee's motion") and the debtor's motion for summary judgment and memorandum in opposition to trustee's motion for partial summary judgment on trustee's objection to debtor's claimed exemption of pension funds (the "debtor's motion"). For the reasons which follow, the Court concludes that the trustee's motion should be granted and the debtor's motion should be denied.

**Introduction and Factual Background**

The parties have filed voluminous briefs, and the record is replete with deposition transcripts, exhibits, and other information. From the record, the following facts are clear and undisputed. In the years before "Black Monday" in October of 1987, the debtor was a successful commodities trader who owned and operated a number of companies. In 1982, the debtor created S.L. Computer Services, Inc. The debtor was the sole shareholder of S.L. Computer Services from the date of formation until at least December 11, 1990.[1] *See* Exhibits "D–4" and "D–6" to the debtor's motion. On June 24, 1982, S.L Computer Services created a Defined Benefit Pension Plan. The debtor executed the plan documents as president and secretary of the plan sponsor and as trustee of the pension fund. *See* Exhibit "D–1" to the debtor's motion.

For virtually all of the time prior to 1990, the debtor was the sole participant in the pension plan. The only other participant appears to have been a non-shareholder named Phyllis Dorio, who was fired by the debtor at some point prior to September of 1986. *See* transcript of the August 19, 1998, deposition of Stephan Jay Lawrence at p. 105. The duration and nature of her participation are unclear at best. While the debtor's motion for summary judgment contends that Ms. Dorio had a vested interest in the pension plan, the debtor's testimony is to the contrary. The debtor testified that he did not believe Ms. Dorio had a vested interest in the plan, and that she never received any distributions from the plan. *See* transcript of the August 19, 1998, deposition of Stephan Jay Lawrence at p. 140; and transcript of the September 10, 1998, deposition of Stephan Jay Lawrence at pp. 227–228.[2]

On December 11, 1990, the debtor allegedly transferred his entire interest in S.L Computer Services to Lynn Gann. The purchase price was purportedly $15,000.00. However, neither the debtor nor Ms. Gann took any steps to document this apparent transfer of ownership. For example, the debtor continued to be listed as an officer and director, as well as resident agent, of the company until May 1, 1998, nearly a year after the bankruptcy filing. *See* Exhibit "I" to the trustee's motion.[3] From

1. As will be discussed further, this is the date at which the debtor allegedly transferred his interest in this company to another person.

2. Additionally, the letter the debtor cited to support this "vesting" contention actually indicates nothing of the sort. The July 24, 1984, letter to Ms. Dorio from the then-plan administrator appears simply to contain instructions regarding the transfer of funds from various accounts. Far from indicating she had a vested interest in the plan, the letter seems to suggest she had no interest in the plan at all (the letter states "[p]lease note that so far this all applies only to Stephan J. Lawrence who is the only participant"). The letter also appears to evidence a concern that even at that time, there might be qualification

problems with the plan (it indicates that the plan administrator would forward recommendations regarding "top heavy" implications, the concern that employees of other entities owned by the debtor might need to be covered under similar plans, and other issues). *See* Exhibit "D–2" to the debtor's motion.

3. The business address of the company also remained the debtor's residential address in North Miami Beach, Florida, despite the fact that Ms. Gann lived in New York City. On May 1, 1998, after the bankruptcy filing and after the Chapter 7 trustee objected to the debtor's exemption in the pension, the business address of the plan sponsor was changed to Ms. Gann's New York City address and the debtor was finally removed from the records

1990 to the present, the company carried on no business and generated no revenues. In addition, Ms. Gann never provided the debtor with any instructions as to how to perform any duties associated with employment by the company, never established a work schedule for the debtor, never required the debtor to provide reports, never provided the debtor with any tools or equipment, never paid the debtor any salary, and never provided the debtor a place to work. *See* transcript of deposition of Lynn Gann at p. 251.

During the time the debtor owned the plan sponsor, he also owned several other entities, including Pompano Windy City Partners, Capital Growth Group, and East Wind Associates. *See* transcript of February 12, 1998, deposition of Stephan Jay Lawrence at pp. 26 and 33; transcript of August 19, 1998, deposition of Stephan Jay Lawrence at pp. 49–52, 83–85, and 115–116; transcript of deposition of Beth Bernstein at pp. 15–18, 23–27, 49–55, 90–93, 119, 122–123, and 126; and Exhibit "A" to the trustee's motion at schedule B, item 13.

These other entities had a number of people working for them. The parties dispute whether they were independent contractors or employees. However, the trustee points out that at least in one instance, there appears to have been a formal written employment contract. *See* Exhibit "N" to the trustee's motion. And many of these people received salaries. *See* transcript of February 12, 1998, deposition of Stephan Jay Lawrence at pp. 22–23; transcript of August 19, 1998, deposi-

tion of Stephan Jay Lawrence at pp. 83–85, 87, and 115–116; and transcript of Beth Bernstein deposition at pp. 15–18, 23–27, 36–40, 49–55, 62–64, and 90–93. The record indicates that none of these people were permitted to participate in the pension plan.

On June 12, 1997, the debtor filed a voluntary chapter 7 bankruptcy proceeding. In conjunction with the bankruptcy, the debtor executed and filed the schedules and statement of financial affairs. On Schedule B, item 11, the debtor identified his interest in the pension plan, and scheduled the pension plan as an exemption on Schedule C. The stated amount of the exemption claim is $450,000.00. *See* Exhibit "A" to the trustee's motion.[4]

### The Untended Pension Plan

Since 1982, the federal tax laws regarding pension plans have been amended at least five times. These amendments include the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), the Deficit Reduction Act of 1984 (DEFRA), the Omnibus Budget Reconciliation Act of 1987 (OBRA), the Retirement Equity Act of 1984(REA), and the Tax Reform Act of 1986 (TRA–86). Each of these amendments required that pension plans be formally amended and restated to reflect applicable changes in the laws. Furthermore, TRA–86 and certain regulations promulgated in connection with those amendments required that any retroactive amendments to pension plans would have to be formally and finally effectuated no later than December 31, 1994. *See* transcript of deposition of

---

of the Florida Secretary of State as an officer and director. At that same time, a new resident agent was appointed for the plan sponsor. The new registered agent is Luis Wolf, a partner in the law firm which serves as counsel to the debtor in these proceedings. Until 1996, the plan sponsor filed form 5500–EZ statements for the pension plan with the IRS, signed by the debtor as "employer (owner) or plan administrator." *See* Exhibit "G" to the trustee's motion.

4. According to the 1996 Form 5500–EZ Annual Return of One Participant (Owner and their Spouses) Retirement Plan filed on behalf of the plan sponsor, at line 8a, the total plan assets at the end of that year were $447,-213.00. *See* Exhibit "G" to the trustee's motion. Given that Mr. Lawrence supposedly transferred ownership of the plan sponsor to Ms. Gann in 1990, it may have been inappropriate for him to continue filing the EZ versions of the form 5500 as he was no longer an "owner" of the company. *See* deposition testimony of Steve Havel at pp. 37–38.

Steve Havel at p. 31; transcript of deposition of Barry Levy at p. 24; and transcript of deposition of Patricia Dilley at pp. 152–153.

The subject pension plan was not amended or restated to take into account any of the changes in the pension-related tax laws at any time prior to the bankruptcy filing. *See* transcript of deposition of Barry Levy at pp. 19–20, and 25; and transcript of deposition of Steve Havel at pp. 30–33. The debtor was apparently aware of the potential tax problems with the pension as early as 1995, as in September of that year he wrote a letter purportedly retaining Preferred Compensation Corporation to "update, if necessary, the [pension plan] so that it fully complies with all current ERISSA (sic) requirements." *See* Exhibit "O" to the trustee's motion. The record is clear that this failure to restate the pension plan and bring it into compliance with the various amendments to the tax code would result in the disqualification of the plan. *See* deposition testimony of Steve Havel at pp. 33–35.

Notwithstanding this 1995 letter, it appears no steps were taken to cure any of the deficiencies in the plan. Only after the bankruptcy filing did the debtor contact a number of people, including Barry Levy, Steve Havel, and an attorney named Sharon Quinn Dixon, and engage them to amend the pension plan as necessary to bring it into compliance with the applicable tax laws. This resulted in a March 16, 1998, letter from Ms. Dixon to the Internal Revenue Service which is styled as a "Voluntary Request for Consideration" under the "Closing Agreement Program" (also known as "CAP"). *See* Exhibit "E" to the trustee's motion. The CAP process is intended to permit so-called "non-amenders" the opportunity to amend their pension plans to correct deficiencies without triggering adverse consequences, albeit after paying certain penalties and fees. *See* deposition testimony of Mr. Havel at p. 47.

The March 16, 1998, letter reflects that the plan sponsor (now helmed by Ms. Gann) executed a new plan document in December of 1997. The letter states that the plan never benefitted more than two employees. Attached is a letter signed by Ms. Gann which provides that the plan has laid "dormant" for a number of years. As will be discussed in greater detail shortly, the debtor believes the IRS will accept the plan amendments and impose only minimal penalties for the failure to amend the plan in a timely fashion. The debtor also believes that he should be able to claim the pension fund as exempt and ride off into the sunset. As Benjamin Franklin wrote, however, "a little neglect may breed mischief ... for want of a nail, the shoe was lost; for want of a shoe, the horse was lost; and for want of a horse, the rider was lost." [5] The Court's obligation is to decide whether the debtor neglected the nails which secured his pension plan, thus leaving it exposed to the reach of the bankruptcy trustee.

## Legal Analysis

The basic dispute here is whether the trustee or the debtor is entitled to the pension funds. The trustee contends that the pension is property of the bankruptcy estate under § 541 and is not exempt. The debtor, on the other hand, contends that the pension is either excluded from the bankruptcy estate pursuant to the dictates of the Supreme Court's decision in *Patterson v. Shumate*, 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), or is properly claimed as exempt under Fla. Stat. §§ 222.21(2) and 222.201. The debtor also raises a host of other barriers to the trustee's claim, most of which can be disposed of quickly.

First, the debtor contends that the trustee's objection to his exemption claim was not filed timely. Fed.R.Bankr.P. 4003(b) provides that an objection to an exemption must be filed within 30 days after the conclusion of the meeting of cred-

**5.** Prefixed to *Poor Richard's Almanac* (1758).

itors, unless "within such period, further time is granted by the court." The debtor complains that in this case, while the trustee's request for an extension of time was filed within the 30–day period, the actual extension was not obtained until after that time. However, the debtor has already raised this issue previously, and Chief Judge A. Jay Cristol ruled that the extension of time was proper. *See* Judge Cristol's February 10, 1998, "Order Denying Debtor's Motion for Reconsideration of this Court's Order of October 22, 1997." [6]

■ The debtor also argues that the Court lacks subject matter jurisdiction because the trustee has failed to join indispensable parties—namely, the plan sponsor and the plan trustee. Perhaps the debtor misunderstands the critical issue at stake, or simply wishes to add another load of buckshot to his shotgun assault on the trustee's objection to his exemption claim. Either way, this contention is unfounded. This dispute is between the debtor and the trustee over whether an asset is property of the estate. Neither the plan sponsor nor the current plan trustee claims any beneficial interest in the pension plan. Further, to the extent that the debtor is arguing that the plan sponsor would somehow be in a position to provide additional information to the Court or the trustee, that fact alone does not render the plan sponsor someone with such a stake in the controversy that they should be rendered a party to the action.[7]

■ Similarly, the Court can quickly dispose of the debtor's claims that the trustee is barred by statutes of limitations, laches, or the like. The debtor cites statutes of limitations regarding fraudulent transfers as if they were applicable in a battle over the debtor's claim that this particular asset is exempt in the context of his bankruptcy proceeding. However, the trustee does not seek to unravel the purported transfer of the plan sponsor to Ms. Gann, nor does the trustee seek control of any of the plan sponsor's assets. Rather, the trustee debates the debtor's right to the pension fund. This issue is not resolved by reference to fraudulent conveyance law because the beneficial interest in the pension fund still belongs to the debtor. Instead, it is a question raised only when the debtor files for protection under the bankruptcy code.

■ The same is true of the debtor's claim that laches somehow protects him. While it is true that the plan has not received any contributions since 1986, and that other parties may have had various rights to disqualify the plan, these facts are simply irrelevant. In the context of this dispute, the trustee is not stepping into the shoes of another creditor, or the IRS, as the debtor seems to perceive the

---

**6.** The debtor is correct that the Supreme Court in *Taylor v. Freeland and Kronz,* 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992), strictly enforced the Rule 4003(b) deadline, albeit in the context of a trustee who simply failed to object *or* seek an extension within the period provided in the rule. And the debtor is also correct that a number of courts have concluded that an extension of time under Rule 4003(b) must be actually obtained within the 30–day period following the meeting of creditors. However, the Court agrees with Judge Cristol's assessment that this approach would produce only "absurd and inefficient results" and hold the trustee hostage to the Court's docket. *See* Judge Cristol's February 10 Order at paragraphs 22–23; *see also In re Statner,* 212 B.R. 164 (Bankr.S.D.Fla.1997).

**7.** The debtor contends that resolution of this dispute cannot result in turnover of the pension fund because it will not have any effect on the plan sponsor. While the Court will not consider any issue not before it, it is sufficient to say that it is possible to resolve the right to the pension as between these parties, and leave for the trustee the burden of determining how to obtain the assets from the plan sponsor. Clearly, however, the Court can conclusively resolve the debtor's right to claim an exemption in an asset; if it is not exempt, the trustee may pursue whatever rights he believes he has in the asset thereafter. *See In re Edmonston,* 107 F.3d 74 (1st Cir.1997) (chapter 7 trustee is designated representative of chapter 7 estate, whose duties include collection and liquidation of non-exempt property of estate).

situation. Under 11 U.S.C. § 541, all of the debtor's property and rights to property are vested in the trustee, who is then charged with distributing the assets of the estate to creditors. *In re Hicks,* 144 B.R. 419 (Bankr.E.D.Ark.1992). Thus, upon filing bankruptcy the trustee succeeds to all of *the debtor's* rights in property, unless the property is excluded from the estate under § 541 or exempt under either § 522 or state law. *See In re Lane,* 149 B.R. 760, 763 (Bankr.E.D.N.Y.1993) (debtor's interest in pension is property of the estate unless excluded under § 541(c)(2) or exempted under § 522(b)(1)).

As a result, the Court is now called upon to decide whether the pension plan is an interest in property subject to control and disbursement by the trustee. Both parties filed motions for summary judgment. A motion for summary judgment is governed by Fed.R.Civ.P. 56, made applicable to bankruptcy proceedings pursuant to Fed. R.Bankr.P. 7056, which provides in pertinent part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56. In ruling on a motion for summary judgment, the Court's function is to determine whether a genuine issue as to any material fact exists, not to resolve any factual issues. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986). Summary judgment should be granted if there can be but one reasonable conclusion as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the parties dispute exactly which of them bears the burden of proof on the issues in this case, the Court concludes

that even when viewing the evidence in a light most favorable to the debtor, there is sufficient evidence to support a decision in favor of the trustee.

■■■ The filing of a bankruptcy petition creates a bankruptcy estate which is comprised of all legal or equitable assets of the debtor existing as of that time. *In re Di Giorgio,* 200 B.R. 664 (C.D.Cal.1996); *In re Turner,* 190 B.R. 836 (Bankr. S.D.Ohio 1996). The only exceptions are for those assets which are excluded from the definition of "property of the estate" under 11 U.S.C. § 541 or are subsequently exempted by the debtor. Both parties agree that the debtor's right to the exemption was fixed as of the filing of the petition. 11 U.S.C. § 522(b)(2)(A) ("an individual debtor may exempt ... property that is exempt ... on the date of the filing of the petition"); *see also In re Bennett,* 192 B.R. 584, 586 (Bankr.D.Me.1996) (analysis of exemption claim focuses on status as of petition date); *In re Pancratz,* 175 B.R. 85, 91 (D.Wyo.1994) (exemptions are determined as of date of filing).[8]

The status of a debtor's interest in a pension plan after the filing of a bankruptcy petition is an issue that has long troubled bankruptcy courts across the country. One of the exceptions to the broad definition of "property of the estate" found in 11 U.S.C. § 541(a)(1) is that "[a] restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a case under this title." 11 U.S.C. § 541(c)(2). For a number of years, there was a dispute as to whether this exception covered not only state spendthrift trusts but also a pension plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA").

In *Patterson v. Shumate,* 504 U.S. 753, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992), the Supreme Court addressed some of these questions when it ruled that a pension plan

---

8. However, as will be discussed shortly, the debtor believes that approval by the IRS of the plan sponsor's post-petition participation in the CAP process retroactively impacts the status of the pension plan—and consequently the validity of his exemption claim.

which was "ERISA-qualified" and contained the requisite anti-alienation provision constitutes an interest subject to a restriction enforceable under "applicable non-bankruptcy law." 112 S.Ct. at 2246–48. As a result, an ERISA-qualified plan is to be excluded from the debtor's bankruptcy estate under § 541(c)(2). *Id., see also Lane,* 149 B.R. at 763; *In re Rich,* 197 B.R. 692, 695 (Bankr.N.D.Okla.1996). The problem left unresolved in the wake of *Patterson* was the exact meaning of the phrase "ERISA-qualified plan." This phrase is not a term of art and is not defined in the bankruptcy code, the Internal Revenue Code, or ERISA itself. *In re Hall,* 151 B.R. 412, 417 (Bankr.W.D.Mich. 1993). ERISA talks of "coverage" of pension plans but does not mention "qualification." Rather, a plan is subject to ERISA depending upon the types of benefits it provides. And while the Internal Revenue Code establishes certain criteria for a pension plan to be "tax qualified," there is no reference to "ERISA qualification." *Id.* at 418.

■ Many courts have struggled to meet this challenge and have attempted to clarify what makes a particular plan "ERISA-qualified." As a preliminary matter, however, it must be remembered that "[t]he existence of an ERISA plan is a question of fact, to be answered in light of all the surrounding facts and circumstances from the point of view of a reasonable person." *Harper v. American Chambers Life Ins. Co.,* 898 F.2d 1432, 1433 (9th Cir.1990); *see also In re Rich,* 197 B.R. 692, 695 (Bankr.N.D.Okla.1996). The Court must determine from the surrounding circumstances whether the plan meets

the requirements of ERISA. *Donovan v. Dillingham,* 688 F.2d 1367 (11th Cir.1982); *In re Pruner,* 140 B.R. 1, 3 (M.D.Fla.1992) (court cannot view plan "within a vacuum").

■ After *Patterson,* courts have seemingly adopted two divergent approaches to determining whether a plan is "ERISA-qualified" or not. The first approach is to conclude that the plan must satisfy both the Internal Revenue Code and ERISA. *Hall,* 151 B.R. at 419. The other view simply determines whether the plan contains the requisite anti-alienation provision and falls within the purview of ERISA. *In re Hanes,* 162 B.R. 733, 740 (Bankr. E.D.Va.1994). The *Hanes* court concluded that to focus on tax qualification places too much emphasis "on the technical requirements of the Internal Revenue Code, while failing to place sufficient emphasis on the Bankruptcy Code." *Id.*[9]

■ This Court, however, disagrees with the *Hanes* analysis. For a court to confirm that the plan is tax qualified does not improperly divert attention from the bankruptcy code. It must be remembered that the definition of "property of the estate" is incredibly broad, and Congress intended that all assets of the debtor would, with only limited exceptions, be turned over to the trustee for administration. *Lane,* 149 B.R. at 763; *Hicks,* 144 B.R. at 420. While exemptions are to be construed so as to further the "fresh start" policy of the code, the Court's obligation remains to enforce those exceptions in accordance with congressional intent.

9. In truth, the *Hall* court notes that there could actually be three interpretations of the phrase "ERISA-qualified." The simplest meaning is that it refers to a plan which is subject to ERISA. It could also mean a plan which is subject to ERISA and contains an anti-alienation provision. Finally, it could mean a plan which is subject to ERISA, contains an anti-alienation provision, and is tax qualified under the Internal Revenue Code. *Hall,* 151 B.R. at 418. The first of these

meanings seems untenable, as the plan must clearly contain an anti-alienation provision to satisfy the requirements of § 541(c)(2), not to mention ERISA itself, which at ·29 U.S.C. § 1056(d)(1) states: "Each pension plan shall provide that benefits under the plan may not be assigned or alienated." Therefore, the question is whether tax qualification is essential to "ERISA qualification" within the meaning of *Patterson.*

When determining whether a pension plan should be excluded from the debtor's estate under § 541(c)(2), logic dictates that the Court scrutinize the plan to establish whether the plan satisfies ERISA. ERISA was enacted to protect private pension benefits and maintain the integrity of pension plans in the face of concerns that such plans failed as a result of underfunding by employers or the lack of appropriate vesting provisions. To assure compliance with ERISA, Congress provided substantial tax incentives to employers. For a plan to gain these benefits and protections, however, it must actually comply with a variety of procedural and substantive provisions. 29 U.S.C. § 1321(a)(2) provides that to be subject to ERISA, a plan must qualify under certain sections of the Internal Revenue Code, most notably 26 U.S.C. § 401. In other words, tax qualification is a component of "ERISA qualification" by the very terms of ERISA itself, and the Court cannot simply ignore its obligation to verify the tax status of the plan.[10]

The Court turns first to the statutory requirements of ERISA. Under 29 U.S.C. § 1002(2)(A), a plan must be established for the benefit of the employee participants. 29 U.S.C. § 1002(7) defines a participant as "any employee or former employee of an employer." Furthermore, ERISA requires that "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan. . . ." 29 U.S.C. § 1103(c)(1). The regulations promulgated by the Secretary of Labor in accordance with ERISA provide that:

(b) *Plans without employees*

For purposes of Title I of the Act, "Employee Benefit Plan" shall not include any plan, fund or pension . . . under which no employees are participants under the Plan.

(c) *Employees*

For purposes of this section . . . an individual and his or her spouse shall not be deemed to be employees with respect to a trade or business, whether wholly incorporated or unincorporated, which is wholly owned by the individual or by the individual and his/her spouse.

29 C.F.R. § 2510.3-3. In accordance with these regulations, the debtor in this case cannot be considered an "employee" of the plan. During all relevant times, he owned the plan sponsor. While he claims the company was sold in 1990, the facts surrounding the case indicate that the sale is not a controlling event. The plan sponsor made no further contributions to the plan after the sale. For that matter, the plan sponsor did not engage in any business and did not generate any revenues. As far as can be ascertained, at least until after the bankruptcy filing the debtor exerted exclusive control over the plan sponsor. He continued to serve as president, acted as resident agent, and signed all tax submissions to the IRS. The debtor's status is such that he simply cannot be considered an "employee" of the plan sponsor. *Rich,* 197 B.R. at 695–696.

The trustee therefore contends that the pension plan cannot be covered by ERISA because it falls under the purview of paragraph (b) of 29 C.F.R. § 2510.3-3

---

**10.** As the *Hall* court noted, the Supreme Court cited not only ERISA but sections of the tax code and various implementing regulations in deciding *Patterson. Hall,* 151 B.R. at 419. This Court agrees that this emphasis indicates that tax qualification is a component of ERISA qualification. Interestingly, at least one author has suggested that as it is the "tax regulations affecting ERISA [which] are paramount," it is tax qualification which is actually the most significant component of this ex-

amination. *See* Jeffrey R. Houle, *Patterson and Its Progeny: ERISA–Qualified Pension Plans as Property of the Estate After Patterson v. Shumate,* 8 Me.B.J. 298 (Sept.1993); *see also* Jeffrey R. Houle, *ERISA–Qualified Pension Plans as Property of the Bankruptcy Estate: A Survey of Creditor's Rights to Participants' Pension Assets Pre– and Post–Patterson v. Shumate,* 29 Hous.L.Rev. 763 (Winter 1992).

and is a plan "without employees." The debtor argues that Ms. Dorio's participation in the plan precludes this result, as she was an employee of the plan sponsor. However, in the case of *In re Acosta,* 182 B.R. 561 (N.D.Cal.1994), the court affirmed the bankruptcy court's finding that certain plans did not qualify under ERISA and stated:

> the parties agree that [the debtor] is the only current participant in the Plans, and . . . it would create potentially abusive situations if a plan were to be considered ERISA-qualified merely by hiring one employee at any time, and for any length, during the life of the plan. . . .

*Id.* at 565.[11] The Court must be mindful of the purpose of ERISA and the reason a plan is subject to ERISA in the first place. The purpose is not to afford employers with a vehicle to hoard hundreds of thousands of dollars once their business ventures have failed. Rather, ERISA was established to maintain the integrity of pension plans for the employees who had been promised their benefits. *See Kwatcher v. Mass. Service Employees Pension Fund,* 879 F.2d 957, 960–61 (1st Cir.1989).

When looking at the totality of the circumstances in this case, it is clear that this is a pension plan without employees. It

was designed for the benefit of the debtor, and he was, for all practical purposes, the sole participant in the plan. While the debtor submits that Ms. Dorio's participation was "significant," there is no evidence that she ever had a vested interest in the plan. The debtor testified that he did not believe she did, and further testified that he did not think she ever received any distributions from the plan. Therefore, the Court concludes that this is exactly the type of "abusive situation" discussed in *Acosta.* To hold that this plan is subject to ERISA would be to elevate fiction over fact. The facts are that the plan was established for the benefit of the debtor, the plan has been operated for the exclusive benefit of the debtor, and the nominal participation of one other person made no significant impact upon the purpose or operation of the plan. *See In re Harris,* 188 B.R. 444, 450–51 (Bankr.M.D.Fla.1995).[12]

Because the plan is not subject to ERISA, the plan is not "ERISA-qualified" under the three-part *Hall* analysis. *Hall,* 151 B.R. at 419–20 (a plan must be tax qualified, contain an anti-alienation provision, and be subject to ERISA; "[i]f even one requirement is not satisfied, a plan is *not* 'ERISA-qualified .' " [emphasis in original]). The Court might be able to stop

---

11. In *Lane,* the court suggested that a debtor might have been able to exclude certain Keogh plans had he not been the only participant in the plans. The court stated that "had the Debtor made contributions to the funds on behalf of at least a single employee, then his plan could potentially be subject to ERISA." 149 B.R. at 766; *see also, Pruner,* 140 B.R. at 3. The Court agrees that the presence of a single employee "may" bring a plan within the purview of ERISA. However, it is the circumstances of the particular case which control the ultimate determination. *Harper,* 898 F.2d at 1433.

12. Further, a sole shareholder employed by a corporation cannot participate in an ERISA-regulated pension plan. In *Kwatcher v. Mass. Service Emp. Pension Fund,* 879 F.2d 957, 960 (1st Cir.1989), the court stated:

> [T]here are cogent reasons why a sole shareholder should be considered an employer as a matter of "economic reality."

> . . . When an individual dominates the actions of a corporate entity—and who rules the corporate roost more singlehandedly than a sole shareholder doubling in brass as the firm's chief executive and principal operating officer?—it seems fair to acknowledge the actuality of the situation: such an individual assuredly acts "in the interest of" the corporation. He is thus subject to classification as an "employer."

> It seems impossible to reconcile the debtor's notion that this plan is somehow "ERISA-regulated" or "qualified" with the fact that he, as the only vested participant, would be prohibited from receiving any benefits under the plan because he is an "employer." *Id.* at 960 ("Since [the debtor] is an 'employer' under 29 U.S.C. § 1002(5), pension payments to him would 'become of advantage to [an] employer,' . . . thereby violating the law").

the analysis at this point were it not for the debtor's claim that the plan is nonetheless exempt under Fla.Stat. §§ 222.21(2) and 222.201. These sections require consideration of the plan's tax status. Therefore, the Court must examine whether the plan satisfies the qualification requirements of the tax laws and the relevant Florida exemption statutes.

■ Fla.Stat. § 222.201 incorporates by reference the provisions of 11 U.S.C. § 522(d)(10). Under § 522(d)(10)(E), a debtor can exempt a pension plan which is not subject to ERISA if certain conditions are met. The section provides, in pertinent part, that a debtor may exempt:

(10) The debtor's right to receive—

(E) a payment under a stock bonus, pension, profit sharing, annuity, or similar plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor, unless—

(i) such plan or contract was established by or under the auspices of an insider that employed the debtor at the time the debtor's right under such plan or contract arose;

(ii) such payment is on account of age or length of service; and

(iii) such plan or contract does not qualify under section 401(a), 403(a), 403(b), or 408 of the Internal Revenue Code of 1986.

When examining the plan in the context of this exemption, it is clear that the plan was created by an "insider" as that term is defined in the bankruptcy code. *See* 11 U.S.C. § 101(31)(A)(iv) (if the debtor is an individual, the term "insider" includes a corporation of which the debtor is a director, officer, or person in control). The plan payments also relate to age and length of service, especially given the vesting requirements. And finally, as will be discussed below, the plan does not qualify under § 401(a) of the Internal Revenue Code.[13]

The debtor also claims that the pension is exempt under FlaStat. § 222.21(2), which provides that:

> Except to the extent provided in paragraph (b), any money or other assets payable to a participant or beneficiary from, or any interest of any participant or beneficiary in, a retirement or profit sharing plan that is qualified under § 401(a), § 403(b), § 408, or § 409 of the Internal Revenue Code of 1986, as amended, is exempt from all claims of creditors of the beneficiary or participant.

This section, like Fla.Stat. § 222.201, requires the determination of the plan's tax qualification. The only section of the Internal Revenue Code which could be applicable to this plan is § 401(a). It is to this that the Court now turns. While the debtor is reluctant to admit that the plan was subject to disqualification, the testimony of Mr. Havel and Mr. Levy clearly reflects that the plan was simply not in compliance with the Internal Revenue Code when the debtor filed bankruptcy. The plan should have been amended and restated by 1994, and it was not. Even the debtor's CAP approval application concedes that there were no amendments or restatements of the plan which would have brought it into compliance with TEFRA, DEFRA, OBRA, REA, and TRA–86 on a timely basis.

■ The debtor suggests, however, that the CAP application is sufficient to retroactively alter the "technical" non-compliance of the plan on the date of filing. He argues that IRS approval of the amended and restated plan would retroactively "qualify" the plan and render it ex-

---

**13.** This is the only code section which is applicable to this plan, and in fact requires the same analysis as would be necessary under the "tax qualification" aspect of the *Hall* test for ERISA qualification. Only § 401(a) deals with qualified pension plans. Section 403(b) addresses employees of tax exempt organizations, Section 408 deals with Individual Retirement Accounts, and Section 409 is applicable only to Retirement Bonds.

empt as of the petition date. However, he cites no genuine authority for this novel proposition. Exemptions are determined as of the date of filing, not based on events which happen subsequently. *Bennett,* 192 B.R. at 586 n. 9. Nothing about the CAP process indicates that it is "retroactive." Even the debtor's own witnesses can muster little more than the suggestion that it has the "technical" effect of retroactive qualification. But even this is not accurate.

What the process permits is for a plan sponsor to get its tax affairs in order without harsh penalties. Once compliance issues are resolved, the IRS will ignore the period of disqualification in the future. *See* Rev.Proc. 98–22, § 3.01 (if defects are cured, the IRS "will not *treat* the plan as disqualified" (emphasis added)). The purpose of the CAP process is to avoid interruption of the tax benefits enjoyed by the plan participants, and to allow the IRS to resolve cases of actual "plan disqualification" in a manner that allows plans to continue to operate. Rev.Proc. 98–22, § 1.01; *see also Weddel v. Commissioner,* T.C. Memo 1996–36. However, this administrative procedure does not alter the relationship between the debtor and the plan, nor does it seek to bar litigation of other issues. Under Rev.Proc. 98–22, § 6.06, it clearly states that "compliance under these programs has no effect on the rights of any other party under any other law."

The debtor argues that this Court should defer to the IRS regarding the issue of tax qualification. In support, the debtor cites the case of *In re Youngblood,* 29 F.3d 225 (5th Cir.1994). In *Youngblood,* the Court concluded that the bankruptcy court should have deferred to an IRS determination that a plan was qualified. In that case, the plan had been audited by the IRS. As the trustee points out, there had therefore been an actual determination that any violations did not warrant disqualification of the plan. The court stated, "the IRS has adopted guidelines for distinguishing between violations of § 401(a) justifying monetary sanctions and violations calling for disqualification." *Id.* at 228.

This Court agrees with the decision in *In re Blais,* 220 B.R. 485 (S.D.Fla.1997). In *Blais,* the court concluded that notwithstanding the policy reasons behind the *Youngblood* decision, those reasons were not applicable in all cases. In *Youngblood,* the court believed that it was best to defer to an IRS determination because the IRS "has a wealth of experience in the practical application of the tax laws." *Youngblood,* 29 F.3d at 228. Where the IRS has not exercised or taken the opportunity to exercise judgment with respect to the operation of a plan, however, a court is not "second guessing" the IRS when it reviews the tax qualification of the plan. *Blais,* 220 B.R. at 489.

■ Furthermore, when the smoke of the debtor's arguments is cleared away, one fact remains evident. The plan was not compliant with the tax code on the petition date. The law looks not only to the form of the plan, but to its operation as well. *Id.* (citing *Cornell–Young Co. v. United States,* 469 F.2d 1318 (5th Cir. 1972)). In this case, the plan was not operated in conformity with the tax code. It had not been amended and restated to bring it into compliance. The post-petition attempt to cure the plan deficiencies under the tax laws cannot alter that simple fact. With that in mind, the plan does not qualify under § 401(a) of the Internal Revenue Code.[14] It is therefore not exempt under either Fla.Stat. § 222.21(2) or § 222.201.

---

14. The Court notes that the trustee had argued that the plan should also be disqualified for its failure to permit the "employees" of the debtor's related entities to participate in the plan. The Court does not reach this issue as it is unnecessary to do so. Furthermore, the dispute over whether these people were employees or independent contractors might require resolution of a factual issue which is inappropriate on summary judgment. *Celotex Corp.,* 106 S.Ct. at 2556.

A little neglect may breed mischief. In this case, it cost the debtor his claim to an exemption for the interest in this pension plan. Had he attended to the plan, perhaps the outcome would have been different. As it stands, however, the trustee is correct. The plan is not excluded from the debtor's estate under § 541(c)(2) because the plan is not ERISA-qualified. It is also not exempt under either of the relevant Florida statutes. Therefore, it is property of the estate and a non-exempt asset which the trustee can attempt to liquidate and dispense to creditors.

Accordingly,

IT IS ORDERED that the trustee's motion for partial summary judgment is granted, and the debtor's motion for summary judgment is denied.